**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | * | |
| **COMPASS MARKETING, INC.** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Case Number: 1:22-cv-00379-GLR** |
| **FLYWHEEL DIGITAL LLC,** *et al.* | * | |
| | * | |
| **Defendants.** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**<u>REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF</u>**
**<u>MOTION TO DISMISS THE COMPLAINT BY FLYWHEEL DIGITAL LLC, JAMES</u>**
**<u>COLUMBUS "CHIP" DIPAULA, JR., PATRICK MILLER, AND ASCENTIAL PLC</u>**

## TABLE OF CONTENTS

**I.    TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................................1

ARGUMENT .........................................................................................................................3

I.   COMPASS'S CLAIMS ARE TIME-BARRED .........................................................................3

    A.    Compass Applies the Wrong Accrual Standard .................................................. 4

    B.    Compass Ignores Its Own Allegations that It Was On Notice of All Claims ......... 5

        1.    Losing Clients Put Compass on Notice of its Claims in 2014 ......................... 5
        2.    Compass's Knowledge of Flywheel's Allegedly "Identical" Competing
        Services Independently Put Compass on Notice in 2014 ............................... 6
        3.    Compass Admittedly Knew Enough to Seek Counsel in 2014 *and* 2016 ....... 7
        4.    Compass's So-Called "Prima Facie Evidence" Was Available in 2015 .......... 7
    C.    Compass's RICO Claims Are Time-Barred (Counts III & IV) ............................ 8

II.  COMPASS'S GRAB BAG OF TOLLING THEORIES FAIL ........................................................9

    A.    Compass Has Not Met Its Burden of Pleading Fraudulent Concealment .............. 9

        1.    Consulting Counsel Twice Is Not Due Diligence ........................................... 9
        2.    The Only Acts of Alleged Concealment Were *by the Whites* ........................ 10
        3.    Flywheel's Open Competition with Compass ............................................... 11
    B.    The "Continuous Violations" Doctrine Does Not Apply to Compass's Claims .. 12

    C.    The Adverse Domination Doctrine is Inapplicable ............................................. 13

III. COMPASS FAILS TO STATE DTSA AND MUTSA CLAIMS (COUNTS I & II) .............14

IV.  COMPASS'S REIMAGINED RICO CLAIM ALSO FAILS (COUNTS III & IV) ...............16

    A.    Compass as the Criminal "Enterprise" ............................................................. 17

    B.    Compass Failed to Allege Any of Its Newly Manufactured Offenses.................. 18

V.   COMPASS IGNORES FATAL DEFECTS WITH ITS STATE-LAW CLAIMS .................19

VI.  THE COURT LACKS PERSONAL JURISDICTION OVER ASCENTIAL ......................19

CONCLUSION....................................................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*AGV Sports Grp., Inc. v. Protus IP Sols., Inc.*,
   2009 WL 1921152 (D. Md. July 1, 2009)........................................................................20 n.22

*Bank of Am., N.A. v. Jericho Baptist Church Ministries, Inc.*,
   2017 WL 193498 (D. Md. Jan. 17, 2017).......................................................................14 n.13

*Birmingham v. PNC Bank, N.A.*,
   2016 WL 3855686 (D. Md. July 15, 2016)..............................................................................8

*Brown v. Hous. Auth. of Baltimore City*,
   2017 WL 3189447 (D. Md. July 26, 2017)............................................................................13

*Cawley v. Bloch*,
   544 F. Supp. 133 (D. Md. 1982)..................................................................................20 n.22

*Chubirko v. Better Bus. Bureau of S. Piedmont, Inc.*,
   763 F. Supp. 2d 759 (W.D.N.C. 2011) ...........................................................18 n.17, 19 n.18

*Coastal Lab'ys, Inc. v. Jolly*,
   502 F. Supp. 3d 1003 (D. Md. 2020).............................................................................20 n.22

*ComRent Int'l, LLC v. Thomson*,
   2021 WL 1733471 (D. Md. May 3, 2021).......................................................................16 n.14

*Doe v. Archdiocese*,
   114 Md. App. 169 (1997) .........................................................................................5 n.3, 6, 7

*Dual Inc. v. Lockheed Martin Corp.*,
   383 Md. 151 (2004) .............................................................................................................5, 9

*Element Fleet Corp. v. Quimby*,
   2019 WL 1293275 (D. Md. Mar. 19, 2019)..................................................................20 n.21

*EndoSurg Med., Inc. v. EndoMaster Med., Inc.*,
   71 F. Supp. 3d 525 (D. Md. 2014)......................................................................................15

*Equity Prime Mortg., LLC v. 1st Fin., Inc.*,
   2019 WL 859135 (D. Md. Feb. 22, 2019) ....................................................................15 n.14

*Fed. Sav. & Loan Ins. Corp. v. Williams*,
   599 F. Supp. 1184 (D. Md. 1984) .................................................................................14 n.13

**Cases**                                                                          **Page(s)**

*Fin. Info. Techs., Inc. v. iControl Sys., USA, LLC*,
    2018 WL 3391379 (M.D. Fla. June 12, 2018), *report and recommendation*
    *adopted as modified*, 2018 WL 4771060 (M.D. Fla. Oct. 3, 2018)....................................7 n.4

*Fowler v. Wells Fargo Home Mortg., Inc.*,
    2015 WL 2342377 (D. Md. May 13, 2015)................................................................9 n.7

*God's Little Gift, Inc. v. Airgas, Inc.*,
    2017 WL 4366751 (W.D.N.C. Oct. 2, 2017)........................................................6 n.4

*Gray v. Riso Kagaku Corp.*,
    1996 WL 181488 (4th Cir. Apr. 17, 1996) ..............................................................20 n.21

*Hardwire, LLC v. Ebaugh*,
    2021 WL 3809078 (D. Md. Aug. 26, 2021) ...............................................................17

*Hecht v. Resol. Trust Corp.*,
    333 Md. 324 (1994) .................................................................................................13

*IHS Glob. Ltd. v. Trade Data Monitor, LLC*,
    2021 WL 2134909 (D.S.C. May 21, 2021)................................................................15

*Ivanti, Inc. v. StayLinked Corp.*,
    2019 WL 4645325 (D. Utah Sept. 24, 2019) ..............................................................6

*Jones v. Pohanka Auto N., Inc.*,
    43 F. Supp. 3d 554 (D. Md. 2014)........................................................................19 n.20

*Kimberlin v. Hunton & Williams LLP*,
    2016 WL 1270982 (D. Md. Mar. 29, 2016),
    *aff'd*, 671 F. App'x 127 (4th Cir. 2016)..................................................................19

*Kimberlin v. Nat'l Bloggers Club*,
    2015 WL 1242763 (D. Md. Mar. 17, 2015)............................................................18 n.17, 19

*MacBride v. Pishvaian*, 402 Md. 572 (2007),
    *abrogated by Litz v. Md. Dep't of Env't*, 434 Md. 623 (2013) ........................................12 n.11

*Mackey v. Compass Mktg., Inc.*,
    391 Md. 117, 892 A.2d 479 (2006) .......................................................................18, 20 n.22

*Mattos v. Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO, Council 3*,
    2020 WL 2027365 (D. Md. Apr. 27, 2020)................................................................5

**Cases**                                                                              **Page(s)**

*MD Helicopters, Inc. v. Aerometals, Inc.*,
  2021 WL 978953 (E.D. Cal. Mar. 16, 2021) ..................................................8 n.6

*Meridian Invs., Inc. v. Fed. Home Loan Mortg. Corp.*,
  855 F.3d 573 (4th Cir. 2017) .....................................................................4

*Mosesian v. Peat, Marwick, Mitchell & Co.*,
  727 F.2d 873 (9th Cir. 1984) ..............................................................14 n.13

*Muhammad v. Maryland*,
  2012 WL 987309 (D. Md. Mar. 20, 2012).................................................5

*Phreesia, Inc. v. Certify Glob., Inc.*,
  2022 WL 911207 (D. Md. Mar. 29, 2022).................................................16

*Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*,
  828 F.2d 211 (4th Cir. 1987) .....................................................................9

*Poffenberger v. Risser*,
  290 Md. 631 (1981) ................................................................................10

*Price v. Waste Mgmt., Inc.*,
  2014 WL 1764722 (D. Md. Apr. 30, 2014)...........................................20 n.21

*Reves v. Ernst & Young*,
  507 U.S. 170 (1993)................................................................................18

*Rizzo-Price v. JP Morgan Chase Bank, N.A.*,
  2019 WL 5698707 (D. Md. Jan. 16, 2019)................................................7

*S-E-A, Ltd. v. Cornetto*,
  2018 WL 3996270 (D. Md. Aug. 21, 2018) ........................................14, 15, 16

*Spirax Sarco, Inc. v. SSI Eng'g, Inc.*,
  122 F. Supp. 3d 408 (E.D.N.C. 2015)......................................................15

*Varieur v. BIS Glob.*,
  2017 WL 4387054 (D. Md. Oct. 2, 2017) .................................................20

*Yesko v. Fell*,
  2014 WL 4406849 (D. Md. Sept. 5, 2014) .......................................17, 18 & n.17

**Other Authorities**

18 U.S.C. § 1836(d) .....................................................................................2, 12

18 U.S.C. § 1962(d) ................................................................................................................17

Fed. R. Civ. P. 9(b) ...............................................................................................11, 18, 19 n.19

Md. Code Ann., Com. Law § 11-1206 ....................................................................................12

## PRELIMINARY STATEMENT

Compass's unexplained, nearly decade-long delay in bringing this action underscores that it lacks any cognizable claims against the Flywheel Defendants and Ascential, as its own lawyers long ago concluded.  Unable to explain that delay or to defend its claims as pleaded, Compass does not respond to many of the Flywheel Defendants' primary arguments and banishes leading authorities to unenlightening footnotes.  Most obviously, Compass waits until page 25 of its 35-page brief before addressing the elephant in the room, namely, why it did not file this lawsuit until:

- nearly *8 years* after two former employees (DiPaula and Miller) resigned on the same day to form Flywheel, tried twice to buy Compass's eCommerce Department, and began offering allegedly "identical services" that "drastically" changed "[t]he opportunities available to" Compass;

- nearly *8 years* after long-time clients began terminating their engagements with Compass despite Compass's apparent belief that so-called "trade secrets" in the eCommerce Guide should have given it a "substantial competitive advantage";

- nearly *7 years* after the PowerPoint deck Compass claims is "prima facie evidence of misappropriation in 2014" was publicly presented at an industry conference (and remains available online today); and

- nearly *6 years* after a "mass exodus" of six Compass employees to Flywheel that, according to Compass, "gutt[ed]" its eCommerce Department.

Br. 8, 10, 13-14 (quoting Compl. ¶¶ 61, 81, 83, 89, 190).[1]

Without question, Compass's own allegations show that it was on notice of its claims: in *2014*, when Flywheel allegedly began competing directly for the same customers; in *2015*, when, with reasonable diligence, it could have found the PowerPoint it now touts as evidence of trade secret theft; and in *2016*, when Flywheel hired away six Compass employees.  Simply put, there

---

[1] Capitalized terms not otherwise defined shall have the meaning contained in the opening brief, ECF 23-1 ("Br."); "Opp." refers to Compass's response in opposition, ECF 44.  All internal quotations and citations have been omitted, and all emphasis added, unless otherwise stated.

is no factual dispute to be resolved as to the timeliness of Compass's claims, because the dispositive facts are alleged in the Complaint.  At this stage, the Flywheel Defendants and Ascential are *accepting them as true*, and Compass must do the same.

Facing dismissal at its own hands, Compass feints left, asserting that it did not have *actual* notice of any of its claims until January 2020, when its new Controller found the Digital Grocery Presentation that was posted on the internet five years earlier for a 2015 eCommerce industry conference.  The DTSA, however, expressly provides that a plaintiff must bring an action no later than three years after the alleged misappropriation "is discovered or by the exercise of reasonable diligence should have been discovered."  18 U.S.C. § 1836(d).  Compass's RICO and state law claims are governed by the same standard.  Yet, Compass does not even attempt to explain why it, ostensibly a sophisticated company that uses the internet as a fundamental business practice, could not have run that same Google search before January 2020, and its resounding silence concedes the point.  More fundamentally, the ruse of supposedly finding an old presentation on the Internet cannot obscure that Compass has been on inquiry notice of its claims since 2014 when Flywheel began competing directly.  That Compass considered legal action in 2014 and 2016 confirms this.

Compass's defense of the adequacy of its pleadings fares no better.  Confronted with unmistakable precedent that a party cannot claim a trade secret in how to use third-party applications, Compass attempts to reframe the eCommerce Guide (which Compass continues to withhold despite local rules permitting filing under seal) as a "compilation" of protocols.  But the cited legal authority does not support Compass's claims.  Moreover, even a cursory glance at the 2015 presentation Compass alleges reveals its trade secrets (which Compass incorporated into the Complaint) confirms Compass has no such protectable trade secret.  (Tellingly, Compass does not even allege that it has attempted to have the 2015 PowerPoint removed from public view.)

2

Compass also does not meaningfully contest that its RICO claim predicated on alleged violations of the DTSA, the sole predicate acts alleged as to the Flywheel Defendants and Ascential, is dead in the water. Instead, Compass now relies on alleged wire fraud, money laundering, and bank fraud violations *by John White's brothers* to support its RICO claims. But the Complaint on its face shows those allegations have nothing to do with the Flywheel Defendants or Ascential, and Compass cannot re-write its Complaint in its brief. Bizarrely, Compass now claims that *it* is the criminal "enterprise" for RICO purposes, but *none of the Flywheel Defendants or Ascential* are alleged to have directed *Compass's* affairs, making them improper defendants.

Finally, Compass has failed to establish personal jurisdiction over defendant Ascential plc, a British company whose U.S. subsidiary purchased Flywheel in 2018, long after the underlying events in this case occurred. Compass's conclusory assertion that DiPaula and Miller are employees of "Ascential" is insufficient to create personal jurisdiction, and the affidavit from Ascential plc shows Messrs. DiPaula and Miller are employed by a different U.S.-based entity.

Compass's opposition papers are a study in diversion. We respectfully submit that the Complaint should be dismissed with prejudice in its entirety.

## ARGUMENT

## I.    COMPASS'S CLAIMS ARE TIME-BARRED

It does not require a "fact intensive inquiry," as Compass argues, to conclude that Compass's claims are time-barred. Opp. 25-26. Rather, as the Flywheel Defendants and Ascential established in their opening brief, the allegations within the four corners of the Complaint put Compass on notice of its potential claims "in 2014" and "certainly by 2016." Br. 13-21. Because all of Compass's claims are subject to 3- and 4-year statutes of limitations, they are time-barred

3

and may be dismissed as a matter of law.  *Id.*; *Meridian Invs., Inc. v. Fed. Home Loan Mortg. Corp.*, 855 F.3d 573, 579 (4th Cir. 2017) (affirming dismissal on statute of limitations grounds).

### A.  Compass Applies the Wrong Accrual Standard

Compass argues that the limitations period for its trade secret claims did not begin to run until January 2020, when Compass alleges it discovered the Digital Grocery Presentation online. Opp. 26-27.[2]  According to Compass, the Digital Grocery Presentation on its face "could only have been generated with knowledge of Compass's trade secret information and proprietary business know how" and is "prima facie evidence of misappropriation" by Flywheel "in 2014."  Br. 9, 14; Compl. ¶¶ 186-87, 190.  Similarly, Compass argues that the limitations period for its RICO and state law claims could not have started until its internal investigation actually "revealed … factual support for Compass's RICO and state law claims …."  Opp. 31.  Put differently, Compass asks this Court to find that the applicable statutes of limitations did not begin to run when Compass was on notice, but only when Compass actually started to conduct diligence.  That is not the standard.

As Compass concedes in its opposition, the 3-year limitations period for its DTSA and MUTSA claims commence when the alleged misappropriation "is discovered *or by the exercise of reasonable diligence should have been discovered*."  Br. 15; Opp. 26.  A similar discovery standard applies for Compass's RICO claims (four years from "when the plaintiff discovered, or should have discovered, the injury") and other state law claims (three years from "when the potential plaintiff is on inquiry notice of such facts and circumstances that would prompt a reasonable person to inquire further").  Br. 17-18; Opp. 30-31.  Thus, contrary to Compass's argument, Opp. 26-27, *actual knowledge* is not required to start the clock with respect to any of Compass's claims.

---

[2] *See also* Opp. 27 ("[T]here was no **notice** to Compass that Flywheel was **using Compass's stolen intellectual property** … until January 2020[.]") (emphasis in Compass's brief).

B.   **Compass Ignores Its Own Allegations that It Was On Notice of All Claims**

Compass's own allegations show it was on notice of its claims in 2014 and certainly by 2016.  Br. 13-14, 16.  In its opposition, Compass largely ignores the legal effect of its pleadings, and thus concedes the point.  *Mattos v. Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO, Council 3*, 2020 WL 2027365, at *3 (D. Md. Apr. 27, 2020); *Muhammad v. Maryland*, 2012 WL 987309, at *1 n.3 (D. Md. Mar. 20, 2012) ("[B]y failing to respond to an argument made in a motion to dismiss, a plaintiff abandons his or her claim.").  Compass cannot avoid its own Complaint.

1.   Losing Clients Put Compass on Notice of its Claims in 2014

Authority both sides rely on, *Dual Inc. v. Lockheed Martin Corp.*, 383 Md. 151 (2004), held "[a]s a matter of law" that the termination of a customer contract puts a potential plaintiff "on notice to investigate *any claims* that might arise from that termination."  *Id.* at 167.[3]  As applied to claims arising from alleged trade secret misappropriation, the *Dual* court found that "knowledge of the termination" is "sufficient to place [a plaintiff] on notice to investigate how another company was able to assume the [customer] contract …."  *Id.* at 169, 175; Br. 16.  For tortious interference claims that (as here) arise from the termination of a customer relationship, the statute of limitations "begins to accrue on the date that the contract was terminated."  *See Dual*, 383 Md. at 168.

Every claim in the Complaint against the Flywheel Defendants and Ascential is based one way or another on the alleged misappropriation of the eCommerce Guide and/or P&G's termination of its engagement with Compass.  *See* Compl. ¶¶ 224-48, 251, 260, 274-75, 280, 284-89, 292, 302-03, 309.  Compass itself alleges that, despite its head start in eCommerce, "[t]he

---

[3] *See also* Br. 18 (citing *Doe v. Archdiocese*, 114 Md. App. 169, 188 (1997)); *Archdiocese*, 114 Md. App. at 188 ("Once on notice of one cause of action, a potential plaintiff is charged with responsibility for investigating, within the limitations period, all potential claims and all potential defendants with regard to the injury.").

opportunities available to" Compass "changed drastically" as soon as "Flywheel arrived on the scene" and that "[s]hortly after DiPaula and Miller left Compass" in 2014, P&G became "unresponsive" and "terminated its engagement" with Compass.  Br. 8, 14.  Compass further alleges *nine other* Compass clients also terminated contracts.  *Id.*  Compass's own allegations thus show it "knew or should have known all of the facts underlying its misappropriation claim in 2014 (when Flywheel was founded and Compass started losing clients)."  Br. 16.  At that point *in 2014*, Compass was "charged with responsibility for investigating, within the limitations period," all claims asserted against all defendants.  *See* Br. 15-18 (citing *Archdiocese*, 114 Md. App. at 188).

        2.        Compass's Knowledge of Flywheel's Allegedly "Identical" Competing Services Independently Put Compass on Notice in 2014

Compass's allegations that Flywheel was directly competing put Compass on notice of its claims in 2014.  In *Ivanti, Inc. v. StayLinked Corp.*, on which Compass relies, the defendant released a new product in 2016, and used it "to compete directly" for customers and "increase their market share significantly."  2019 WL 4645325, at *1 (D. Utah Sept. 24, 2019).  The court found the allegations "support[ed] the inference that Ivanti did not have reasonable notice of any misappropriation *until StayLinked's competing product was released in 2016*."  *Id.* at *3.  Put differently, knowledge of the competing product started the clock.  Here, Compass knew right away in 2014 that Flywheel "offered and continues to offer *identical services as Compass*" and became Compass's "*main competitor*."  Br. 14 (quoting Compl. ¶ 61).  Thus, its knowledge of Flywheel's "identical" competing services independently started the clock ***in 2014***.[4]

---

[4] The other cases Compass cites in other jurisdictions are not to the contrary.  Opp. 27.  In *God's Little Gift, Inc. v. Airgas, Inc.*, for example, the court found plaintiffs were on notice of trade secret claims when they realized they "had been the target of unscrupulous and fraudulent market manipulation."  2017 WL 4366751, at *3 (W.D.N.C. Oct. 2, 2017).  For similar reasons, allegations that Flywheel "gut[ted]" the eCommerce Department and "drastically" changed Compass's

3.      Compass Admittedly Knew Enough to Seek Counsel in 2014 *and* 2016

Moreover, Compass admits that it knew enough facts to seek legal counsel as to potential claims concerning Flywheel's founding in 2014 and the 'mass exodus' in 2016.  Br. 16.  Compass tries to avoid the consequences of its own allegations by arguing that it only sought legal advice about "***non-solicitation issues***" but not "***trade secret claims***."  Opp. 28 (emphasis in Compass's brief).  That is a distinction without a difference.  Under Maryland law, inquiry notice of one cause of action charges a potential plaintiff "with responsibility for investigating, within the limitations period, all potential claims and all potential defendants with regard to the injury."  Br. 18 (citing *Archdiocese*, 114 Md. App. at 188).  The Complaint shows that Compass was well aware of facts that put Compass on notice of its claims.  That Compass now conveniently contends it "did not learn of their potential legal significance" until it ran a Google search several years later not only makes no sense; it "does not save [its] claims from being time-barred."  Br. 16-17 & n.12 (citing *Rizzo-Price v. JP Morgan Chase Bank, N.A.*, 2019 WL 5698707, at *4 (D. Md. Jan. 16, 2019)).[5]

4.      Compass's So-Called "Prima Facie Evidence" Was Available in 2015

Compass also does not meaningfully contest that Compass "knew or should have known all of the facts underlying its misappropriation claim … certainly by 2016 (*when Flywheel hired*

---

prospects put Compass on notice of its claims "certainly by 2016."  Br. 10, 16.  *Financial Information Technologies, Inc. v. iControl Systems, USA, LLC*, where the court found "[a] genuine issue" on "record evidence," is inapposite.  2018 WL 3391379, at *5 (M.D. Fla. June 12, 2018), *report and recommendation adopted as modified*, 2018 WL 4771060 (M.D. Fla. Oct. 3, 2018).

[5] Compass asserts in its opposition that Ascential and the Flywheel Defendants "do not state when Compass purportedly should have known of the facts underlying the state law claims."  Opp. 30.  Yet the Flywheel Defendants and Ascential dedicated more than a page to describing the specific allegations in the Complaint from 2014, 2015, and 2016 that put Compass on notice of its claims.  Br. 13-14.  For example, Counts V (breach of contract), VI and VII (tortious interference), XII and XIV (conspiracy), and XIX (aiding and abetting) all arise in whole or in part from P&G's termination of its engagement with Compass, Compl. ¶¶ 274, 280, 286-88, 317, 323-24, 338, which put Compass on notice of all claims in 2014.  Br. 13-14, 16, 19 (citing *Dual*).

*away Compass employees and Compass could have—from a simple internet search—read … [the]*

*Digital Grocery Presentation, which Compass claims is "prima facie evidence" of its claims*)."

Br. 16.  On the face of the Complaint, Compass discovered the 2015 Digital Grocery Presentation

on the internet, where it remains available today.  Br. 9, 12; Compl. ¶ 186.  Compass does not

contend—let alone allege—that the Digital Grocery Presentation was unavailable or

undiscoverable between 2015, when the deck was presented at an industry conference, and January

2020, when Compass allegedly "discovered" it.  Br. 9, 16.

As previously explained, a motion to dismiss on statute of limitations grounds may be

granted where the very information that allegedly put the plaintiff on notice of its claim was (as

here) "neither unknowable nor undiscoverable during the limitations period."  Br. 16 (citing

*Birmingham v. PNC Bank, N.A.*, 2016 WL 3855686, at *5 (D. Md. July 15, 2016)).  Given

Compass's own allegations, Compass was "clearly armed with enough information … to trigger a

reasonable plaintiff's diligent investigation of any potential causes of action" "certainly by 2016."

Br. 16; *Birmingham*, 2016 WL 3855686, at *5 (dismissing negligent misrepresentation claim

where, among other things, "the information contained in the transaction journal … was neither

unknowable nor undiscoverable during the limitations period").[6]

### C.    Compass's RICO Claims Are Time-Barred (Counts III & IV)

Compass's RICO claims, predicated on the same alleged theft of trade secrets in 2014, are

time-barred for the same reasons.  Br. 17-18.  While Compass now asserts there are other predicate

acts alleged as to the Flywheel Defendants concerning supposed "fraudulent payments," Opp. 14-

---

[6] In *MD Helicopters, Inc. v. Aerometals, Inc.*, Opp. 28, by contrast, the reports purportedly
containing trade secrets "were submitted confidentially" by defendants "to the FAA and protected
from public disclosure."  2021 WL 978953, at *3 (E.D. Cal. Mar. 16, 2021).  That is not the case
here, where the Digital Grocery Presentation remains publicly available.  Compl. ¶ 186.

15, that is not what the Complaint says (as discussed below), and these new predicate acts are not actually pled as to the Flywheel Defendants or Ascential under notice pleading or the heightened pleading standard for fraud-based claims.  Any claims arising from the "severance payments" are at all events time-barred because the checks from Daniel White were from 2015, nearly seven years before the Complaint was filed, and Compass does not allege that the checks were undiscoverable with reasonable diligence from its own accounting records.  *See* Br. 18 n.13.[7]

## II.   COMPASS'S GRAB BAG OF TOLLING THEORIES FAIL

### A.   Compass Has Not Met Its Burden of Pleading Fraudulent Concealment

Compass does not contest that it must "plead *with specificity* facts that would tend to support … fraud and concealment," including, for example, (1) "specific or detailed factual assertions as to how" the defendant "concealed from [plaintiff] its alleged role in the termination of the [customer] contract" and (2) that it "failed to discover those facts within the statutory period, despite (3) the exercise of due diligence."  Br. 19 (citing *Dual*, 383 Md. at 170-71, and *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 218 (4th Cir. 1987)); *see also* Opp. 21 (listing elements of fraudulent concealment claim).  Compass has not met its burden.

#### 1.   Consulting Counsel Twice Is Not Due Diligence

Compass does not contest it had a duty under state law "to investigate the circumstances surrounding [clients'] termination" once aware that it was losing clients in 2014.  Br. 20.  Compass also does not meaningfully contest it failed to do so.[8]  In fact, ***the only*** "examples of Compass's

---

[7] In its opposition, Compass fails to mention—let alone distinguish—the cited case law dismissing RICO claims as time-barred based on allegations as to the defendants' actions.  Br. 17-18; *e.g.*, *Fowler v. Wells Fargo Home Mortg., Inc.*, 2015 WL 2342377, at *3 (D. Md. May 13, 2015).

[8] For example, Compass does not contest that, as described in the opening brief, it failed to: (i) "identify any steps taken to investigate *why* P&G and others terminated their contracts with Compass, *how* Flywheel was able to assume those contracts without Compass's purportedly valuable trade secrets, or *who* would be providing them with eCommerce services if not Compass";

due diligence" Compass identifies during the nearly 4.5 years between September 2014 (when DiPaula and Miller resigned) and February 2019 (when the Whites were removed from Compass's board) is seeking legal advice twice "when DiPaula and Miller left and its employees quit to join Flywheel." Opp. 35. That does not suffice. A plaintiff "cannot fail to investigate when the propriety of the investigation is naturally suggested by circumstances known to him; and if he neglects to make such inquiry, he will be held guilty of bad faith and must suffer from his neglect." Br. 18 (quoting *Poffenberger v. Risser*, 290 Md. 631, 637-38 (1981)). That is the case here.

### 2.      The Only Acts of Alleged Concealment Were *by the Whites*

Compass also fails to plead any fraudulent concealment by the Flywheel Defendants or Ascential. In its opposition, Compass misleadingly asserts that "[t]he Complaint details *the Defendants'* fraudulent concealment with particularity, including ghost employees, the use of the [IRS] and secret bank accounts to embezzle and launder money, and the severance scheme to fund and operate Flywheel." Opp. 34. But the allegations as to so-called "ghost employees," the IRS, and secret bank accounts ***ascribe no role to the Flywheel Defendants or Ascential.*** *See generally* Compl. § C.I. ("The Secret Compass Bank Account Scheme"), § C.II. ("The Ghost Employee Scheme"), and § C.III. ("The IRS Tax Check Scheme"). The allegations as to what Compass calls the "severance payment scheme" are also limited to what *the Whites* purportedly "caused," "issued," or intended. Opp. 14.[9] And none of these allegations explain why Compass was unable to investigate its claims given the facts alleged in the Complaint.

---

(ii) "allege any steps it took to investigate whether any of the six employees who left Compass in 2016 to work for Compass's main competitor took any files with them"; or (iii) even "conduct a simple internet search for several more years" after the 2016 "mass exodus" of Compass employees to Flywheel. Br. 20 & n.14.

[9] While not essential to the motion, Ascential's intervening purchase of Flywheel, Compl. ¶¶ 209-11, confirms that none of the White Defendants ever had any interest in Flywheel. Br. 2 n.1.

Moreover, while Compass asserts in cursory fashion that "[t]he Complaint gives the who, what, when, where, and why required by Rule 9, *down to the specific dates that emails were sent*," the only emails identified are DiPaula's and Miller's resignation emails and DiPaula's email attempts to buy Compass's eCommerce Department. *Compare* Opp. 21 (citing Compl. ¶¶ 75, 78-80) *with* Compl. ¶¶ 75, 78-80. Compass makes no effort to explain how these emails amount to a material misstatement or an omission of material fact. Nor does Compass cite any legal support for holding Ascential liable for fraudulent concealment for purportedly having "taken no action to correct the course of conduct" in connection with an alleged misappropriation of trade secrets *by Flywheel* that occurred (if at all) *years* before Ascential was even on the scene. Opp. 21.[10]

### 3.    Flywheel's Open Competition with Compass

Compass's assertion that the Flywheel Defendants acted in secret, Opp. 21, 34, is wholly contradicted by the Complaint's allegations. The Complaint alleges Flywheel was openly competing with Compass from day one, offering "identical services" to the same customers and "drastically" changing Compass's prospects, while also offering (unsuccessfully) to buy Compass's eCommerce Department twice in writing and, immediately after DiPaula's and Miller's non-solicitation provisions expired, "gutting" the eCommerce Department by hiring away six Compass employees. Compl. ¶¶ 61, 78-80, 83, 89. Even the purported "prima facie evidence of misappropriation" was, on the face of the Complaint, publicly presented at an industry conference and posted online in 2015, where it has remained for the better part of a decade. Br. 19. That is not fraudulent concealment; Flywheel's conduct was open and notorious.

---

[10] Contrary to Compass's insinuations, Opp. 14 n.3, the routine boilerplate disclosures in the "Independent auditor's report" section of Ascential's Annual Report that KPMG LLP "perform[s] procedures to address" certain risks are irrelevant. *See* Opp. Ex. A; Ascential plc Annual Report 2021, https://annualreport.ascential.com/pdfs/Ascential%20Annual%20Report%202021.pdf

B.      **The "Continuous Violations" Doctrine Does Not Apply to Compass's Claims**

Compass concedes in its opposition that its misappropriation claims are "continuous in nature."   Opp. 29.   Both the DTSA and MUTSA expressly provide that "a continuing misappropriation constitutes a single claim" of misappropriation for statute of limitations purposes such that Compass's trade secret claims "accrued when Compass discovered or should have discovered the facts underlying the alleged 2014 theft of the eCommerce Guide" in 2014.  Br. 15 (citing 18 U.S.C. § 1836(d); Md. Code Ann., Com. Law § 11-1206).   Unhappy with this clear statutory language, Compass simply ignores it—and asks this Court to extend Maryland's *common law* "continuous violations" doctrine to toll its statutorily-defined trade secret claims.  Opp. 29.  It takes no citation to authority to conclude that Compass cannot so easily bat aside a federal statute.

Compass also argues that the "continuous violations doctrine … applies equally to the allegations of racketeering and other misconduct addressed by the state law claims."  Opp. 31.[11] But the doctrine is inapplicable to DTSA claims, the sole RICO predicate offense alleged in the Complaint as to the Flywheel Defendants and Ascential.  Br. 24-25.  The continuous violation doctrine likewise is unavailable for the new predicate acts conjured up in Compass's brief, because "the other three predicate acts aris[ing] from the severance payment scheme"—which involved "two separate checks" issued back in 2015—were not *continuing acts*.  Opp. 14, 29.[12]

---

[11] The single Maryland case cited by Compass—in which the Court *declined* to apply the continuing harm doctrine to "continuing ill effects from the original alleged violation"—does not support extending this common law doctrine to Compass's other claims. Opp. 31 (citing *MacBride v. Pishvaian*, 402 Md. 572, 584 (2007), *abrogated by Litz v. Md. Dep't of Env't*, 434 Md. 623 (2013)); *see also* Opp. 30 (citing *Litz*, 434 Md. at 641). *Litz* also makes clear that—even if a claim is not time-barred (which they all are here)—damages "are limited to those occurring within the three year period prior to the filing of the action," i.e., *after* Michael and Daniel White were removed from Compass's board on February 14, 2019. 434 Md. 623, 646 (2013).

[12] In its opposition, Compass unequivocally accuses "Flywheel/Ascential" of "currently engaging in *new acts* of trade secret misappropriation through the ongoing unauthorized use of Compass's

Finally, Compass does not identify any decision extending the continuous harm doctrine to any of its other state law claims, including tortious interference, which allegedly arose from discrete events (i.e., contract terminations and the "mass exodus"). *E.g.*, Br. 31-32; *Brown v. Hous. Auth. of Baltimore City*, 2017 WL 3189447, at *4 (D. Md. July 26, 2017) ("The continuing violations theory does not apply when a plaintiff alleges discrete violations.").

### C. The Adverse Domination Doctrine is Inapplicable

As the Maryland Court of Appeals explained in *Hecht v. Resolution Trust Corp.*, the adverse domination doctrine *does not* apply to delay claim accrual where (as here) "there was someone who had the knowledge, ability and motivation to bring suit during the period in which" Michael and Daniel White purportedly "controlled the corporation." 333 Md. 324, 352 (1994); Opp. 32 (citing *Hecht*, 333 Md. at 339). That person is Compass's CEO, John White, who, on the face of the Complaint, actually *did* consider bringing claims against the Flywheel Defendants during the limitations period. Compl. ¶¶ 81, 89-90, 92. While Compass purports to question Daniel White's legal advice, it is clear that John—not his brothers—had final authority to accept or reject the legal advice he received. *Id.* And if he did not like the advice, John clearly had the power to (and later did) fire his brothers, *id.* ¶ 94, have them replaced on Compass's Board of Directors (which he also did), *id.* ¶ 95, and seek new counsel (as he has done). Thus, even setting aside the fact that DiPaula and Miller have not been employees (let alone officers or directors of Compass at any time) since 2014, the adverse domination doctrine does not apply because

---

trade secrets." Opp. 29 (citing Compl. ¶¶ 11, 184, 191). But the three cited paragraphs refer only to the 2015 Online Materials Compass conveniently alleges it did not *discover* until January 2020.

Compass's own CEO had the knowledge, ability, and motivation to bring suit during the limitations period.[13]

## III.   COMPASS FAILS TO STATE DTSA AND MUTSA CLAIMS (COUNTS I & II)

Compass claims to seek trade secret protection for "methods/processes/protocols that Compass implements to analyze the data" downloaded from third-party Amazon's website and "assist its clients in optimizing their business potential on" Amazon's website.  Opp. 11-12.  Put differently, Compass concedes the eCommerce Guide merely describes how Compass and its clients should use Amazon's platform.  Br. 22-23; *see* Opp. 6-7.  The Digital Grocery Presentation, which simply shows public Amazon product searches and other public information, reinforces this conclusion.  *See* Ex. 2.  Judge Bredar dismissed similar claims absent allegations that the "method of using a third-party vendor's software and hardware could not be developed independently … outside of" the plaintiff.  Br. 22; *S-E-A, Ltd. v. Cornetto*, 2018 WL 3996270, at *3 (D. Md. Aug. 21, 2018) (dismissing DTSA claim).  Counts I and II fail for the same reason.  Br. 22-23.

Unable to meaningfully challenge or distinguish Judge Bredar's holding, Compass relegates its mention of *S-E-A* to a footnote, focuses on "client contact database[s]" (which are irrelevant and were not discussed in the opening brief), and simply notes that the allegations as to the "3D-scanning process" in *S-E-A* "were too conclusory to be plausible."  Opp. 10 n.2.  Even if

---

[13] As Compass concedes, the adverse domination doctrine was adopted to address claims against *controlling officers and directors*.  Opp. 32.  Compass's cited cases, which concerned employees or outsiders directly participating in wrongdoing *by the controlling officers and directors*, do not support extending the state law doctrine to the former employees here.  *Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873, 875, 879 (9th Cir. 1984) (auditor used "questionable accounting practices" to obscure misconduct); *Bank of Am., N.A. v. Jericho Baptist Church Ministries, Inc.*, 2017 WL 193498, at *4 (D. Md. Jan. 17, 2017) (bank ignored unauthorized access to plaintiff's accounts and assisted in wrongfully depleting funds); *Fed. Sav. & Loan Ins. Corp. v. Williams*, 599 F. Supp. 1184, 1194-95 (D. Md. 1984) (employee mismanaged the business at issue).  Because Compass's allegations show the doctrine does not apply, the Court need not reach this issue.

true, Compass still does not—and cannot—point to any allegations in the Complaint supporting a reasonable inference that someone outside of Compass could not arrive at the same "data-driven insights" by simply downloading Amazon data themselves.  Br. 5, 22-23.  Compass's argument that *Compass itself* "independently developed" the how-to guide misses the point entirely.  Opp. 9-10.  Rather, the question both in *S-E-A* and under the applicable statutes is whether the purported trade secret is "readily ascertainable through proper means" *by someone other than the one seeking protection*.  Br. 21-23.  The answer here on the face of the Complaint is yes.  Br. 21-24.

Compass's reliance on *IHS Global Ltd. v. Trade Data Monitor, LLC*, for the proposition that it is "axiomatic that compilations of information receive trade secret protection" is both misleading and unavailing.  2021 WL 2134909, at *7 (D.S.C. May 21, 2021).  As the *IHS* court goes on to explain, protected "compilations" may include "compiling customer, pricing, product, or supplier information."  *Id.*; *see also EndoSurg Med., Inc. v. EndoMaster Med., Inc.*, 71 F. Supp. 3d 525, 547 (D. Md. 2014) ("customer list" with "compilation of customer preferences" had economic value); *Spirax Sarco, Inc. v. SSI Eng'g, Inc.*, 122 F. Supp. 3d 408, 426 (E.D.N.C. 2015) ("old and new product prices, along with [its] quoted prices and internal costs for services," including "highly sensitive and confidential information regarding discounts and other means of incentivizing customers to do business with [plaintiff] rather than its competitors").  That is not what Compass alleges here.  Indeed, Compass does not allege *any* customer-specific information whatsoever.  Compass's attempts to shoehorn the eCommerce Guide into recognized trade secret categories by calling it a "compilation of *protocols*," Opp. 8-9, finds no support in the cited cases.[14]

---

[14] In none of the decisions cited in § I of Compass's brief—other than *S-E-A*, where Judge Bredar dismissed the trade secrets claim—did plaintiffs seek protection over how to use a third-party platform.  *See, e.g.*, *Equity Prime Mortg., LLC v. 1st Fin., Inc.*, 2019 WL 859135, at *6 (D. Md. Feb. 22, 2019) (finding plaintiff "adequately pleads *a* trade secret" *without deciding "what*

Compass's argument that its how-to guide "could not have been reproduced at Flywheel," Opp. 12, is contrary to its own allegations and legal authority.  As previously explained, Compass itself frames the eCommerce Guide as a shortcut allowing Flywheel "to rapidly accelerate, or avoid altogether, any research and development required to provide" the same services.  Br. 23 (quoting Compl. ¶ 87).  *Phreesia, Inc. v. Certify Global, Inc.*, which Compass relies on, Opp. 10, is illustrative.  2022 WL 911207 (D. Md. Mar. 29, 2022).  There, the plaintiffs alleged (among other things) that the proprietary software and algorithms were "composed of millions of lines of code" and "constantly improved through state-of-the-art machine learning"; and that to "reverse engineer …, it would take hundreds of logins to chart the software's responses to different queries." *Phreesia*, 2022 WL 911207, at *12.  Based on those allegations, the court concluded that the information was "not generally known in the industry or readily ascertainable through proper means."  *Id.*  Even if DiPaula and Miller had actually taken a copy of the 2014 eCommerce Guide when they left (which is not alleged), the "insights" there required no software and would not reflect any updates since 2014.[15]  Having failed to allege that its Amazon best practices circa 2014 were not readily ascertainable, Compass's DTSA and MUTSA claims based on the eCommerce Guide may be dismissed.  Br. 22-23; *S-E-A*, 2018 WL 3996270, at *3.

## IV.  COMPASS'S REIMAGINED RICO CLAIM ALSO FAILS (COUNTS III & IV)

Compass concedes both that Ascential is not alleged to have committed any RICO predicate act and that the only alleged offense by the Flywheel Defendants—i.e., the continued

---

*specifically constitute[s] Equity's trade secrets*"); *ComRent Int'l, LLC v. Thomson*, 2021 WL 1733471, at *1, 8 (D. Md. May 3, 2021) (trade secrets included industry-specific safety standards for plaintiff's own product and confidential information for designing electrical test equipment).

[15] Compass's argument as to CDAP also misses the point.  Opp. 12-13.  There are no allegations from which to infer the manual 2014 eCommerce Guide had any "independent economic value" given the post-2016 software automation tools allegedly at Compass and on Amazon.  Br. 23 n.19.

use of trade secrets—"falls outside the scope of conduct prohibited under § 1832" and therefore cannot support a RICO claim as a matter of law.  Opp. 13-15; Br. 24-25.  Compass does not even try to distinguish Judge Bredar's decision in *Hardwire, LLC v. Ebaugh*, dismissing a RICO claim predicated (as here) on post-2016 "use" of trade secrets.  2021 WL 3809078, at *7 (D. Md. Aug. 26, 2021).  Nor does Compass challenge that the RICO enterprise "cannot be any of the named defendants … or an association of the Flywheel Defendants and Ascential as a matter of law."  Br. 26.  That ends the matter, and the RICO claims may be dismissed.

Recognizing this, Compass tries to fashion a new RICO theory out of whole cloth—i.e., that "[t]he severance payment scheme, standing alone, is sufficient to demonstrate a pattern of racketeering" "attributable" to the Flywheel Defendants and that the RICO enterprise is *Compass itself*.  Opp. 13-16.  That is not what the Complaint says.  The so-called "severance payments" are RICO predicates as to "Michael and Daniel" White—not the Flywheel Defendants.  Compl. ¶ 255(b).  And, despite what Compass now says, Opp. 15, it does not allege the payments constitute money laundering, wire fraud, or bank fraud.[16]  Compass's new theory is properly disregarded.  *Yesko v. Fell*, 2014 WL 4406849, at *7 (D. Md. Sept. 5, 2014) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.").

A.    **Compass as the Criminal "Enterprise"**

Incredibly, Compass abandons any claim that the RICO enterprise is an association of defendants and argues instead that *Compass itself* is the criminal "enterprise."  Opp. 16-17 ("Here, the RICO enterprise is a distinguishable, legal entity, so [the] collaboration/agreement requirement

---

[16] *Compare* Compl. ¶ 255(b) ("fraudulent severance payments" as to "Michael and Daniel" only) *with* ¶ 255(c) ("unauthorized bank accounts" as money laundering, mail fraud, wire fraud, bank fraud), ¶ 265(c) (same), ¶ 310(c) (same), ¶ 329 (same), ¶ 344(c) (same); *see also id.* ¶¶ 99-107.

does not apply."); Br. 25-27.  But § 1962(c) applies to those "*employed by or associated with* any enterprise" that "*conduct or participate* … in the conduct of such enterprise's affairs *through a pattern of racketeering activity*," Opp. 16, and does not "reach complete 'outsiders' because liability depends on showing that the defendants conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs."  *Reves v. Ernst & Young*, 507 U.S. 170, 177, 185 (1993).  If, as Compass now argues, *Compass* is the "enterprise" and the "pattern of racketeering" is the "severance payment scheme" in October and December of *2015*, Opp. 13-16, then neither Ascential nor any of the Flywheel Defendants are proper defendants under § 1962(c).  As alleged, the first payment was "more than 13 months *after* DiPaula [and Miller] resigned," Compl. ¶¶ 75, 203, nearly three years *before* Ascential acquired Flywheel, *id.* ¶ 209, and there are no allegations as to how any of the above directed *Compass's* affairs in late 2015.  Counts III and IV both fail.

### B.  Compass Failed to Allege Any of Its Newly Manufactured Offenses

The new predicate offenses Compass now seeks to attribute to the Flywheel Defendants—which all sound in fraud, *see* Opp. 14 (arguing "false premise"), and must satisfy Rule 9(b)[17]—also fail as a matter of law.  *First*, Compass is not "a financial institution" and "cannot bring civil RICO claims premised on bank fraud …."  *Yesko*, 2014 WL 4406849, at *10 (collecting cases). *Second*, Compass does not even try to explain how its bare-bones allegations adequately plead the elements of wire fraud or money laundering as to the Flywheel Defendants, let alone *with particularity*.  Opp. 14.  At most, Compass alleges *Daniel White* had two cashier's checks totaling $35,000 issued in DiPaula's name only "*using Daniel's personal funds*."  Compl. ¶¶ 203, 205.

---

[17] *E.g.*, *Kimberlin v. Nat'l Bloggers Club*, 2015 WL 1242763, at *4-5 (D. Md. Mar. 17, 2015) (wire fraud); *Yesko*, 2014 WL 4406849, at *9-11 (bank fraud); *Chubirko v. Better Bus. Bureau of S. Piedmont, Inc.*, 763 F. Supp. 2d 759, 766-68 (W.D.N.C. 2011) (money laundering).

Merely receiving money is not money laundering or wire fraud.  *E.g.*, *Nat'l Bloggers Club*, 2015 WL 1242763, at *9 (no RICO claim based on "only *receipt* of proceeds derived from the alleged money laundering") (emphasis in original); *see also Kimberlin v. Hunton & Williams LLP*, 2016 WL 1270982, at *8 (D. Md. Mar. 29, 2016) (no mail fraud where plaintiff "does not allege the time, place, and contents of the false representations sent by the Defendants"), *aff'd*, 671 F. App'x 127 (4th Cir. 2016).[18]  The allegations Compass cites as to *the Whites'* acts, statements, and intent are not to the contrary.  Opp. 14.  Counts III and IV also fail under Compass's new RICO theory.

## V.    COMPASS IGNORES FATAL DEFECTS WITH ITS STATE-LAW CLAIMS

Unable to fix fatal pleading defects identified in the opening brief, Compass ignores them. For example, Compass does not contest its failure to plead any acts or misstatements *by the Flywheel Defendants or Ascential* to conceal the alleged misappropriation—let alone justifiable reliance.  *Compare* Br. 27 *with* Opp. 21-22.  Or any third-party breach of contract for its tortious interference claim.  *Compare* Br. 31-32 *with* Opp. 18-19.[19]  Nor does Compass contest that its unjust enrichment and contract claims impermissibly overlap.  *Compare* Br. 33 *with* Opp. 19-20 & n.4.[20]  Compass's state law claims fail for the same reasons as in the prior brief.  Br. 27-33.

## VI.   THE COURT LACKS PERSONAL JURISDICTION OVER ASCENTIAL

Nothing in Compass's response establishes personal jurisdiction over Ascential plc.  *First*,

---

[18] Even assuming the *December* check from Compass to Daniel White was improper, Compl. ¶ 204, there are no allegations the earlier *October* check to DiPaula was derived from "specified unlawful activity," as required for money laundering.  *E.g.*, *Chubirko*, 763 F. Supp. 2d at 767.

[19] The cases on which Compass relies make clear that, while the "single tort" of tortious interference is broader, a third-party breach is required to plead tortious interference *with existing contractual relations*.  Opp. 18.  Thus, Compass must satisfy Rule 9(b).  Br. 31-32.

[20] *Jones v. Pohanka Auto North, Inc.*, which dismissed claims against eleven car dealerships based on a contract for one vehicle, does not support the argument that overlapping tortious interference claims fail only against contracting parties.  43 F. Supp. 3d 554, 558, 560, 573 (D. Md. 2014).

the Complaint does *not* allege that DiPaula, Miller, or Acevedo are *employees* of Ascential plc (as Compass asserts in its opposition, Opp. 23-24), and the undisputed evidence from Ascential plc is that it has no employees in Maryland. *E.g.*, Meads Decl. ¶¶ 7, 11 ("Flywheel employs its own personnel to conduct business in Maryland," who "are not employees of Ascential."); *Varieur v. BIS Glob.*, 2017 WL 4387054, at \*1 (D. Md. Oct. 2, 2017) ("[W]hen a defendant's sworn affidavit contradicts the allegations in the complaint, the plaintiff bears the burden to present an affidavit or other evidence showing jurisdiction exists."). *Second*, Compass has identified no authority that the meager touch points for Painter and Gradden suffice to confer specific jurisdiction over Ascential plc in Maryland, *see* Opp. § IV.B., and makes no attempt to distinguish the cited legal authority to the contrary. Br. 34-35.[21] *Third*, as explained in the opening brief, yet Compass ignores, its conspiracy theory of personal jurisdiction is precluded by the intracorporate conspiracy doctrine. Opp. 22-23; Br. 35.[22] *Fourth*, Compass's RICO claims are not colorable. Br. 34 n.30.

## CONCLUSION

The Complaint establishes that Compass's claims are time-barred and insufficiently pleaded. Compass has not established personal jurisdiction over Ascential. Accordingly, all claims against the Flywheel Defendants and Ascential should be dismissed with prejudice.

---

[21] *E.g.*, *Gray v. Riso Kagaku Corp.*, 1996 WL 181488, at \*3 (4th Cir. Apr. 17, 1996); *Element Fleet Corp. v. Quimby*, 2019 WL 1293275, at \*3 (D. Md. Mar. 19, 2019); *Price v. Waste Mgmt., Inc.*, 2014 WL 1764722, at \*12 (D. Md. Apr. 30, 2014).

[22] *E.g.*, *AGV Sports Grp., Inc. v. Protus IP Sols., Inc.*, 2009 WL 1921152, at \*4-5 (D. Md. July 1, 2009). None of the cited cases warrants a different conclusion. *See Coastal Lab'ys, Inc. v. Jolly*, 502 F. Supp. 3d 1003, 1020 (D. Md. 2020) (conspiracy between unrelated companies); *Cawley v. Bloch*, 544 F. Supp. 133, 135 (D. Md. 1982) (rejecting attempt to use conspiracy theory to establish personal jurisdiction); *Mackey v. Compass Mktg., Inc.*, 391 Md. 117, 148, 892 A.2d 479, 497 (2006) (answering certified questions without addressing intracorporate conspiracy doctrine).

Dated: New York, New York  Respectfully submitted,
    May 25, 2022

By: _____/s/_____

VENABLE LLP
G. Stewart Webb, Jr. (Bar No. 00828)
Anthony J. Vitti, Jr. (Bar No. 21293)
750 East Pratt Street, Suite 900
Baltimore, Maryland 21202-3142
Telephone: (410) 244-7400
Fax: (410) 244-7742
gswebb@venable.com
ajvitti@venable.com

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
Michael C. Keats
Rebecca L. Martin
Arthur Kutoroff
One New York Plaza
New York, New York 10004-1980
Telephone: (212) 859-8000
Fax: (212) 859-4000
michael.keats@friedfrank.com
rebecca.martin@friedfrank.com
arthur.kutoroff@friedfrank.com

*Attorneys for Flywheel Defendants and Ascential*

WOMBLE BOND DICKINSON (US) LLP
David B. Hamilton (Bar No. 04308)
100 Light Street, 26th Floor
Baltimore, Maryland 21202-1036
Telephone: (410) 545-5800
Fax: (410) 545-5801
david.hamilton@wbd-us.com

*Attorney for James C. DiPaula, Jr. and Patrick Miller*

21

29817267

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 25, 2022, I caused the foregoing Reply Memorandum to be electronically filed with the Clerk of the Court and served on all counsel of record via the CM/ECF filing system.  I FURTHER CERTIFY that as-filed courtesy copies of the foregoing papers will be delivered to the Clerk's office within 48 business hours of filing.

_____
/s/

Anthony J. Vitti, Jr. (Bar No. 21293)