IN THE UNITED STATES DISTRICT COURT
FOR THE DISTICT OF MARYLAND

| | | |
|---|---|---|
| COMPASS MARKETING, INC. | : | |
| Plaintiff | : | |
| v. | : | Case No. 1:22-cv-00379-GLR |
| FLYWHEEL DIGITAL LLC, *et al*. | : | |
| Defendants | : | |

## DANIEL WHITE'S REPLY IN SUPPORT OF MOTION TO DISMISS

Defendant Daniel J. White, by and through counsel, Bruce L. Marcus, Esquire, Sydney M. Patterson, Esquire, and MarcusBonsib, LLC, hereby submits this Reply in support of his Motion to Dismiss and accompanying Memorandum of Law (ECF 42).

## PRELIMINARY STATEMENT

Daniel White moved to dismiss Plaintiff's claims as time-barred and further moved this Court to dismiss the RICO claims as inadequately pled, and to decline to exercise its supplemental jurisdiction over the state law counts, or, in the alternative, to dismiss certain of those counts for failure to state a claim. Compass's Opposition[1] (ECF 47) does not cure the defects outlined in Daniel White's Motion to Dismiss.

To compensate for this failure, the Opposition argues in more than one instance that the White Defendants "do not dispute" or "do not contest" various facts alleged in the Complaint. As one example, Compass boldly claims that the "White Defendants do not contest the allegation that Compass was unaware of the injuries allegedly inflicted by the White Defendants until after February 14, 2019." Opp. 7. This statement is as irrelevant as it is wrong. In support of it,

---

[1] Compass's combined opposition to the White Defendants' motions to dismiss is cited and referred to herein as "Opposition." Daniel White's Memorandum of Law (ECF 42) is cited as "Brief" ("Br").

Compass offers a citation to page 4 of Daniel White's Motion, the same page that plainly states in footnote: "Defendant Daniel White assumes the truth of the well-pleaded factual allegations in the Complaint solely for purposes of this Motion to Dismiss." Daniel Br. 4 n.2.  Given this footnote and the well-known standard of review to which it refers, Compass's specious attempt to argue that the White Defendants do not contest certain facts is telling.

For clarity, to the extent Daniel White summarizes or refers to the facts alleged in the Complaint, he does not adopt them as true. To the contrary, many of the allegations asserted by Compass are false and contradicted by documentary evidence within Compass's possession. Notwithstanding their falsity, Daniel White is constrained to accept these allegations for purposes of the motion to dismiss.

## ARGUMENT[2]

### I.  COMPASS'S CLAIMS ARE TIME-BARRED

Compass does not allege that it was impossible to have uncovered the White Defendants' conduct through the exercise of reasonable diligence, but that it was under no obligation to conduct such a review unless and until it was on inquiry notice. Opp. 8.  In doing so, Compass attempts to overcome their statute of limitations problem by breaking up the component parts of their RICO claim and addressing only the alleged improper use of corporate funds. Compass ignores the component which purports to serve as the tenuous linchpin of the alleged RICO enterprise, to wit, that the White Defendants shared a common purpose of harming Compass to hide "their acts of facilitating and helping fund the use of the misappropriated Compass trade

---

[2] In light of Compass's single consolidated response in opposition to the motions to dismiss filed separately by Daniel White and Defendants Michael and George White, Daniel White hereby adopts and incorporates by reference the arguments set forth in Defendant Michael and George White's Reply (ECF 49).

secrets, proprietary business know how, and confidential information by Defendants Flywheel, DiPaula, and Ascential." Compl. ¶ 254.

Compass ignores this critical component of their RICO claim against the White Defendants because it is indisputable that Compass was on inquiry notice of the alleged trade secret misappropriation claims in 2014, and thus had an obligation to investigate all potential claims and potential defendants related thereto. According to the RICO claim, this would have included the White Defendants' alleged use of improper corporate funds which was directly related as part of the same fraudulent scheme. Compl. ¶ 254.

Compass's own allegations show that it was on notice of the alleged trade secret misappropriation claims in 2014, when, among other things, DiPaula and Miller resigned to start their own company, Compl. ¶ 75, tried to buy the eCommerce Department, *Id.* ¶¶ 78, 80, and established Flywheel which became Compass's "main competitor" offering identical services and causing "the opportunities available to Compass" to change "drastically," *Id.* ¶ 61, while at the same time P&G stopped responding to Compass, *Id.* ¶ 197, and nine other Compass clients terminated contracts with Compass to hire Flywheel. *Id.* ¶ 317. As a result of these occurrences, Compass considered legal action in 2014. *Id.* ¶ 81.

With regard to misappropriation of trade secrets claims, "knowledge of the termination" of customer contracts is "sufficient to place [a plaintiff] on notice to investigate how another company was able to assume the [customer] contract[.]" *Dual Inc. v. Lockheed Martin Corp.,* 383 Md. 151, 169, 175 (2004). Compass had knowledge of the termination of customer contracts in 2014 and was therefore on notice of its trade secret misappropriation claims as a matter of law. *Id.* Once on notice of these claims, Compass had a duty to investigate all potential claims and all potential defendants with regard to the injury to Compass. *Doe v. Archdiocese,* 114 Md. App.

169, 188 (1997) ("Once on notice of one cause of action, a potential plaintiff is charged with responsibility for investigating, within the limitations period, all potential claims and all potential defendants with regard to the injury."); *Poffenberger v. Risser*, 290 Md. 631, 637-38 (1981) (a plaintiff "cannot fail to investigate when the propriety of the investigation is naturally suggested by circumstances known to him; and if he neglects to make such inquiry, he will be held guilty of bad faith and must suffer from his neglect.").

Because Compass was on notice in 2014 of a key component of the fraudulent scheme alleged in their RICO claim, Compass was charged with the responsibility to investigate not only how Flywheel was able to assume Compass contracts, but also "all potential claims and all potential defendants," with regard to the harm to Compass, including the alleged improper use of corporate funds by the White Defendants which was related as part of the same fraudulent scheme according to the allegations in the Complaint. *Id.*; *Dual Inc.,* 383 Md. at 169, 175.

### A. The Alleged Fiduciary Relationship Does Not Toll the Statute of Limitations

The existence of a fiduciary relationship will only "toll the statute of limitations if: (1) the relationship continued unrepudiated, (2) there is nothing to put the injured party on inquiry, and (3) the injured party cannot be said to have failed to use due diligence in detecting the fraud." *Windesheim v. Larocca*, 443 Md. 312, n.20 (2015). Compass fails to establish these elements.

As set forth above, Compass's own allegations establish that it was on inquiry notice as early as 2014. Additionally, the Complaint alleges that the alleged fiduciary relationship was repudiated as of November 23, 2018 when John White fired Daniel White. Compl. ¶ 94. Even if Compass had established the necessary elements to toll the statute of limitations based on the fiduciary relationship, Compass's own allegations dictate that any such tolling would terminate on November 23, 2018.  Lastly, Compass has failed to establish that it exercised due diligence in

detecting the fraud. Instead, Compass only argues, without success, that it was excused from doing so by reason of the alleged fiduciary relationship.

### B. The Adverse Domination Doctrine Does Not Apply

The adverse domination doctrine does not save Compass's claims from the statute of limitations.  Compass argues the "disinterested majority" version of the adverse domination doctrine applies here. Opp. 12. This version relies on the presumption that "control of the association by culpable directors and officers precludes the possibility of filing suit because these individuals can hardly be expected to sue themselves or initiate action contrary to their own interests." *Hecht v. Resolution Trust Corp.,* 333 Md. 324, 347 (1994).

Here, the Complaint fails to allege in the first instance that the corporation was controlled by culpable directors and officers.  There is no allegation in the Complaint regarding the identity or number of individuals on the Board of Directors at any time relevant to the Complaint.  Even if alleged, the presumption that control by culpable directors precludes the possibility of filing suit may be rebutted by evidence that some other individual had knowledge of the cause of action and the ability and motivation to bring suit. *Id.*

In this case, this presumption is easily rebutted by Compass's own allegations that John White, the CEO of Compass, did consider bringing claims and had the final authority to do so. Compl. ¶¶ 81, 89–90, 92.  That John White was individually and unilaterally able to fire both Daniel and Michael White and remove and replace them on Compass's Board of Directors, establishes that at all relevant times John White controlled the corporation. *Id.* ¶¶ 94–95. In addition to the ability to bring suit if he so desired, John White also had knowledge of the cause of action as set forth above.

### C. Alleged Fraudulent Concealment Does Not Toll the Statute of Limitations

In order to demonstrate that fraudulent conduct by defendants tolls the statute of limitations, a complaint must specifically allege "how the fraud kept the plaintiff in ignorance of a cause of action, how the fraud was discovered, and why there was a delay in discovering the fraud, despite the plaintiff's diligence." *Porter v. GreenPoint Mortg. Funding, Inc.,* Civ. A. No. DKC-11-1251, 2011 WL 6837703, at *6 (Dec. 28, 2011). Compass fails to set forth these allegations. The Complaint alleges that the White Defendants engaged in fraudulent concealment by manipulating accounting records but fails to explain why the same was undiscoverable through the ordinary exercise of reasonable diligence. Compass maintains only that the fraud was discovered by an alleged forensic fraud examiner but does not detail the steps that would have been required to discover it, if in fact it was concealed. Compl. ¶¶ 95–97.

The mere fact that a forensic fraud examiner discovered the alleged misappropriations does not mean that a fraud examiner was required to do so. Indeed, the Complaint is noticeably silent as to the reason for hiring a fraud examiner, much less why it followed the allegedly unrelated termination of Michael White for an unprofessional email, and Daniel White for reasons not explained.[3] Compl. ¶ 94.

In sum, Compass attempts to avoid stating that the alleged misappropriations were undiscoverable through reasonable diligence by stating that they were discovered through a forensic fraud examination. That a forensic fraud examination was employed says nothing about

---

[3] Compass alleges that "the Complaint demonstrates that when Michael and Daniel White began acting in a manner that was openly disruptive to Compass's business operations, Compass removed them from the company's Board of Directors, . . ." Opp. 12. Contrary to this representation, the Complaint alleges nothing about Daniel White's disruptive conduct. Compl. ¶ 94.

6

the acts of concealment nor the ability of Compass to discover the fraud through its own due diligence over an alleged period of twenty years.

Given John White's control of Compass as a majority shareholder, director, and CEO who was directly involved in and controlled all operations of Compass, John White "cannot seriously contend" that, prior to February 2019, he was unable to discover the alleged unlawful activities by which he claims Daniel and Michael White violated RICO. *Gross v. Waywell,* 628 F. Supp. 2d 475, 500 (S.D.N.Y. 2009) ("A majority shareholder or principal of a corporation involved in the operations of the business cannot seriously contend that he did not know about or cold not reasonably have discovered RICO violations he complaints about long after the expiration of the statute of limitations.").

## II.     THE RICO CLAIMS FAIL

Although Compass attempts to recast its RICO claims, the refashioned claims do not address the pleading defects raised in Daniel White's motion to dismiss. The RICO claim in Count III must therefore be dismissed because Compass fails to adequately allege the existence of both an "enterprise" and a "pattern" of racketeering activity. Accordingly, their RICO conspiracy claim in Count IV also fails as a matter of law. Br. 7.

### A.  Enterprise

As set forth in the motion to dismiss, the Complaint fails to adequately plead the elements of a RICO enterprise. Br. 8–9.  Compass does not address this argument. Instead, Compass responds to an argument not raised and brazenly places it in quotation marks although the quoted language does not appear in Daniel White's motion. Opp. 14 ("The White Defendants contend the Complaint fails to identify 'any specific enterprise among the White Defendants' at all.

M&G Br. at 11–12; Daniel Br. at 8–9."). What Daniel White *did* argue,[4] and what Compass fails to address, is that **Complaint fails to allege facts or specific allegations regarding the relationships between any of the Flywheel Defendants, on one hand, and Defendants Daniel, Michael, and George White, on the other hand, much less "how they function[ed] as a continuing unit."** *Grant v. Shapiro & Burson, LLP,* 871 F. Supp. 2d 462, 473 (D. Md. 2013).

The Opposition makes no attempt to address this argument. Instead, Compass addresses a RICO enterprise not alleged in the Complaint, one consisting of only Daniel White and Michael White which entailed a single goal to steal from Compass for their own personal gain rather than to promote the shared objectives of the racketeering enterprise alleged in Count III comprised of the White Defendants and Flywheel Defendants.

At best, the RICO enterprise Compass describes in its Opposition comprises two separate organizations—the legitimate entity of Compass, of which Daniel and Michael were employees and which they used as the means to carry out alleged racketeering activities; and the Flywheel Defendants functioning as a unit to engage in racketeering activities. The Complaint, however, does not allege two separate RICO enterprises, but one. Compass's focus on demonstrating only that Daniel and Michael White allegedly coordinated to engage in predicate acts does not suffice to show that they were part of an enterprise whose members included the Flywheel Defendants. *See Boyle v. United States,* 556 U.S. 938, 947 n.4 (2009) (stating that proof that "several individuals, independently and without coordination, engaged in a pattern of crimes listed as RICO predicates" would be insufficient "to show that the individuals were members of an enterprise.").

---

[4] Br. 8.

8

Although Compass now declares in their Opposition that "the RICO enterprise alleged in the Complaint ***is Compass itself***,"[5] the Complaint fails to allege any information regarding the hierarchy, organization, and activities of this alleged enterprise to support the allegation that Flywheel Defendants were members and had operational responsibilities. *See Reves v. Ernst & Young,* 507 U.S. 170 (1993) (noting RICO liability under Section 1962(c) requires that a defendant be a participant "in the operation or management of the enterprise itself."). According to the Complaint, Defendants DiPaula and Miller terminated their employment with Compass in 2014 and had no role in the conduct or operation of Compass's affairs at any point thereafter. Compl. ¶ 75. As a whole, the Complaint is entirely silent as to the internal workings and organization of the alleged enterprise, and the conduct and participation of its alleged members.

The generalized allegations in the Complaint, lacking specific facts showing how all Defendants acted together as a unit are insufficient to plead a RICO enterprise.

### B.  Pattern

The fraudulent acts alleged by Compass do not amount to a "pattern" of such conduct by Daniel and Michael White.  Rather, what Compass portrays as a pattern is a single fraudulent scheme with a single purpose: to steal from Compass for personal gain. *See Int'l Data Bank, Ltd. v. Zepkin,* 812 F.2d 149, 154–55 (4th Cir. 1987) ("If the commission of two or more "acts" to perpetrate a single fraud were held to satisfy the RICO statute, then every fraud would constitute a 'pattern of racketeering activity.'"). The alleged participants were Daniel White and Michael White. The sole victim was Compass. The predicate acts were those of ordinary fraud, using company assets to pay personal expenses or to make allegedly improper payments to relatives. No threat of continuing or renewed criminal activity existed at the end of the scheme because

---

[5] Opp. 14 (emphasis in original).

Daniel White and Michael White were fired from Compass in 2019 for reasons, according to Compass, having nothing to do with discovery of the fraud, which Compass alleges occurred only *after* they were terminated.

To accept Compass's allegations and allow a pattern of racketeering to flow from a single, limited scheme to defraud such as this one would eliminate the pattern requirement altogether and "undermine Congress's intent that RICO serve as a weapon against ongoing unlawful activities whose scope and persistence pose a special threat to social well-being." *Zepkin*, 812 F.2d at 155.

Here, there is no indication that Daniel White, acting alone or with Michael White, has engaged in criminal activities elsewhere, and Compass has not alleged any victims other than Compass. Compass attempts to conjure other victims from the allegations in the Complaint but fails to do so sufficient to bolster the limited fraudulent scheme into one "whose scope and persistence pose a special threat to social well-being." *Zepkin,* 812 F.2d at 155. These other "victims" include Todd Mitchell, a former Compass officer who was allegedly harassed and defamed, and former clients of Compass whose contracts were allegedly interfered with. Opp. 18 (citing Compl. ¶ 159; 165-68).

With regard to Todd Mitchell, the Complaint merely alleges that Daniel White reported to the Department of Labor ("DOL") that Mitchell embezzled funds. Compl. ¶ 159. The Complaint does not set forth allegations sufficient to show this report constituted defamation or harassment. Among other things, the Complaint does not allege the report was false, that it resulted in harm to Mitchell, or that Mitchell was even aware of it. Rather, the Complaint states that the DOL investigation into the allegation is ongoing, suggesting that the falsity of the report is not as clear as Compass argues. Compl. ¶ 161. Even if the Complaint demonstrated

harassment and defamation of Mitchell, which it does not, it fails to demonstrate how the report was made "in pursuit of [Daniel and Michael White's] fraudulent schemes." Opp. 18. Compass makes no effort to identify the fraudulent scheme they refer to or state how this conduct was made in furtherance of it.

With regard to the Compass clients that were also allegedly "victims" of the fraudulent scheme, the Complaint fails to demonstrate even remote or speculative injury caused by the conduct attributed to Daniel White. The Complaint asserts nothing more than that these companies were allegedly mailed anonymous letters. Compl. ¶¶ 165–68. There is no allegation regarding the content of the letters nor any attempt to describe how the clients were made "victims" by virtue of receiving them. To the extent the Opposition now alleges that the letters interfered with contractual relationships of the companies, the same is not alleged in the Complaint. The fact that clients received a letter whose contents, if any, are unknown is insufficient to support an inference of contractual interference.

Compass alleges that these allegations are sufficient to demonstrate that there is more than one victim of the alleged RICO scheme and cites *CVLR Performance Horses, Inc. v. Wynne*, 524 F. App'x 924, 926 (4th Cir. 2013) as a case where a motion to dismiss was denied where the defendants' racketeering activity injured not just the plaintiff corporation but also "that corporation's individual employees and insurers." Opp. 19. The racketeering victims in *Wynne,* however, were not limited to the plaintiff's own employees and insurers as Compass suggests.

Rather, in *Wynne,* the defendant was the sole owner of two entities, Rivermont and 1650 Partners, which he used in his fraudulent schemes. 524 F. App'x at 925. Although Rivermont was not authorized to engage in banking activities under Virginia law, Wynne held it out as a bank and used it in various ways to facilitate his fraudulent schemes, many of which "targeted

11

women in financial distress, who thought he was a banker." *Id.* Thus, unlike in this case, the RICO schemes alleged in *Wynne* were directed broadly at women in financial distress, as opposed to a single plaintiff. The court in *Wynne* addressed in detail the racketeering acts perpetrated by the defendant on other women victims separate and apart from the plaintiff corporation CVLR, and its president, Crystal Rivers:

> Wynne also used Rivermont and 1650 Partners in schemes that did not involve CVLR or Rivers. For example, Karen Foster, who believed that Rivermont was a bank, sought financing from Rivermont in early 2006. Over time, Wynne loaned Foster small amounts of money, and Foster came to consider Wynne a friend. In August 2006, Wynne convinced Foster to execute a note agreeing to repay him $40,000 for the series of small loans he had made and to secure the note with Foster's home.
> . . . .
> Finally, Wynne used Rivermont in a scheme against another acquaintance, Vicki Marsh. In November 2006, Wynne bought a certificate of deposit for Rivermont from First Bank and Trust Company. He then used his status as a customer of First Bank to convince the bank to open a credit line for Marsh, which increased her credit score. With Marsh's credit score increased, another bank was willing to loan her approximately $500,000, secured by a mortgage on her property on Pawley's Island, South Carolina. However, Wynne arranged for the $500,000 to be paid to him, not Marsh.
> . . . .
> *Wynne,* 524 F. App'x at 926–27.

Even if Compass had established that Mitchell and certain clients were harmed as they now claim, neither contractual interference nor defamation are acts of fraud which would render them victims of racketeering by the alleged enterprise like the third-party victims in *Wynne*.

In sum, Compass fails to show any conduct perpetrated by the Defendants apart from the alleged conduct directed against Compass. The Complaint alleges only a single, limited scheme to defraud one victim that "does not rise above the routine, and does not resemble the sort of extended, widespread, or particularly dangerous pattern of racketeering which Congress intended to combat with federal penalties." *Flip Mortgage Corp. v. McElhone,* 841 F.2d 531, 538 (1988).

12

### III. THE COURT SHOULD DECLINE TO EXERCISE ITS SUPPLEMENTAL JURISDICTION AND DISMISS THE REMAINING STATE LAW CLAIMS

Compass does not contest that pursuant to 28 U.S.C. § 1367(c)(3), this Court has discretion to decline to exercise supplemental jurisdiction over Compass's state law claims their federal claims are dismissed. Nor does Compass argue why this Court should not heed the Supreme Court's admonition that where "federal claims are dismissed before trial . . .the state law claims should be dismissed as well." *United Mine Workers of Am. V. Gibbs,* 383 U.S. 715, 726 (1996). Compass has not alleged any unique aspect of this case which would justify a departure from district courts' regular practice of declining to exercise supplemental jurisdiction over state law claims following the dismissal of a federal RICO claim on which subject matter jurisdiction had been based. Br. 13 (citing *Bhari Info. Tech. Sys. Priv. Ltd. v. Sriram,* 984 F. Supp. 2d 498, 505–06 (D. Md. 2013)).

### IV. COMPASS IGNORES THE DEFICIENCIES IN ITS STATE LAW CLAIMS

Compass largely fails to address any of Daniel White's arguments regarding the deficiencies in Compass's state law claims against Daniel White. Br. 13–18.

#### A. Fraudulent Concealment/Fraud (Count X)

Compass fails to demonstrate that the Complaint alleges justifiable and detrimental reliance on Daniel White's alleged legal advice. Compass instead advances a circular argument asserting that Daniel White had a duty to disclose an alleged conflict of interest, which it labels a "fraudulent omission." Opp. 24. That Compass contends the legal advice was tainted by a "fraudulent omission" does not obviate the need to plausibly allege justifiable reliance thereon, facts tending to show that the omission was made with the intent to deceive, and that but for that omission, Compass would have taken legal action and escaped the injury it claims to have suffered. Br. 15 (citing *See Hoffman v. Stamper,* 385 Md. 1, 32–38 (2005)). The Complaint has

13

not alleged these facts and Compass's Opposition fails to demonstrate otherwise. The allegations do not satisfy the particularity requirement of Rule 9(b) and fail to state a claim for fraud.

### B.  Conspiracy and Aiding and Abetting (Counts XI, XV, XVI, XXI)

Compass does not dispute that the conspiracy and aiding and abetting counts against Daniel White must fail upon the dismissal of the substantive underlying tort claims. Br. 14–15, 16 (citing *Marshall v. James B. Nutter & Co.,* 758 F. 3d 537, 541 (4th Cir. 2014)).

Even if the underlying torts survive dismissal, however, these counts will nevertheless fail because Compass has failed to show that it has adequately alleged a meeting of the minds between the alleged conspirators. Br. 15, 17. Compass confirms that it relies only on its allegations "upon information and belief," that Daniel White has an undisclosed financial interest in Flywheel, and that the White Defendants provided financial support to Flywheel. Opp 22. None of these allegations, however, establish that Daniel White and the Flywheel Defendants "agreed to work together in concert" as alleged in the conspiracy counts, or "substantial assisted and encouraged one another" as alleged in the aiding and abetting count.

### CONCLUSION

For the foregoing reasons and those set forth in Daniel White's Memorandum of Law, this Court should grant Defendant Daniel White's Motion to Dismiss.

Respectfully submitted,

MARCUSBONSIB, LLC

　/s/ *Bruce L. Marcus*
Bruce L. Marcus (Bar No. 06341)
Sydney M. Patterson (Bar No. 19036)
6411 Ivy Lane, Suite 116
Greenbelt, Maryland 20770
Telephone: (301) 441-3000
Fax: (301) 441-3004
bmarcus@marcusbonsib.com
spatterson@marcusbonsib.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on this 31st day of May, 2022, copies of the foregoing Motion to Dismiss, supporting memorandum of law, and proposed order were electronically filed and served on all counsel of record via CM/ECF.

                                                    /s/ *Bruce L. Marcus*
                                                    Bruce L. Marcus