IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| COMPASS MARKETING, INC., | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. GLR-22-379 |
| FLYWHEEL DIGITAL, LLC, et al., | * | |
| Defendants. | * | |

*** 

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants Flywheel Digital, LLC ("Flywheel"), James Columbus DiPaula, Jr., Patrick Miller, and Ascential, PLC's (collectively, "Flywheel Defendants") Motion to Dismiss (ECF No. 23), Defendants Michael White and George White's Motion to Dismiss (ECF No. 41), and Defendant Daniel White's Motion to Dismiss (ECF No. 42). The Motions are ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2021). For the reasons set forth below, the Court will grant the Motions.

## I.  BACKGROUND[1]

### A.  Factual Background

Plaintiff Compass Marketing, Inc. ("Compass") is a successful marketing company led by John White that helps large retail companies market consumer products online.

---

[1] Unless otherwise noted, the Court takes the following facts from the Complaint (ECF No. 1) and accepts them as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007).

(Compl. ¶¶ 2, 18, 32, ECF No.1). Compass brings this sprawling lawsuit against Daniel and Michael White, John's brothers, George White, John's nephew, DiPaula and Miller, former Compass employees, and Flywheel and Ascential, PLC, Compass' competitors. (See generally id.). The eighty-page Complaint covers a host of claims, but primarily alleges that Flywheel Defendants stole Compass' trade secrets or otherwise benefitted from their use, and Daniel, Michael, and George engaged in widespread fraud. Specifically, Compass claims that Daniel and Michael engaged in fourteen years of "substantial mail and wire fraud, money laundering, embezzlement, and attempted extortion" so that they could "finance a life of luxury for themselves and their immediate family members." (Id. ¶¶ 97–98). Further, Compass alleges that George locked its IT systems in an extortion attempt. (Id. ¶ 256).

### 1.     Trade Secret Allegations against Flywheel Defendants

Since its formation in 1998, Compass has built a robust eCommerce department "that served the biggest [consumer product] manufacturers in the world," such as Amazon, Staples, and Office Depot. (Id. ¶ 3). Compass has expended significant resources to create the proprietary business methods and strategies that have led it to success. (Id. ¶ 4). In 2010 and 2011, Compass hired DiPaula and Miller to run its eCommerce department. (Id. ¶ 5). DiPaula and Miller did not have prior eCommerce experience, so Compass trained them extensively on its proprietary methods. (Id. ¶¶ 5, 51). Eventually, DiPaula and Miller became "trusted senior executives" running "the fastest growing part of Compass." (Id. ¶ 5).

But DiPaula and Miller sent John their resignations on September 4, 2014. (Id. ¶¶ 15, 75). In his message, Miller thanked John for the opportunity and told him, "Like you, I've long wanted to own my own company. To do so, I'm . . . resigning from Compass." (Id. ¶ 75). DiPaula and Miller formed Flywheel, "a rival eCommerce company," the day before they resigned. (Id. ¶¶ 76–77).

Compass alleges that in 2014, DiPaula, Miller, and Flywheel stole "virtually all of Compass's trade secrets." (Id. ¶ 76). Further, Compass claims that its opportunities "changed drastically" when Flywheel was founded, as "Flywheel offered and continues to offer identical services as Compass." (Id. ¶ 61). On October 1, 2014, less than a month after their resignations, DiPaula emailed John to ask whether he and Miller could buy Compass' eCommerce wing, stating, "Patrick and I remain interested in the spin-off concept, as we feel vested in our colleagues we recruited and trained, and the clients we have nurtured these past few years." (Id. ¶ 78 (emphasis in original)). On October 8th, DiPaula emailed John again and emphasized "the urgency of completing an agreement quickly," and repeating their interest in buying Compass' eCommerce business. (Id. ¶ 80). That sale does not appear to have taken place, and Compass alleges that "unbeknownst" to the Company or John, DiPaula and Miller had already stolen Compass' proprietary information. (Id.).

Daniel served as Compass' General Counsel at the time. (Id. ¶ 18). Compass alleges that John showed the DiPaula and Miller emails to Daniel "and sought legal advice regarding how [Compass] should proceed." (Id. ¶ 81). According to Compass, Daniel advised against pursuing legal action against the Flywheel Defendants "and should instead

compete with Flywheel in the marketplace." (Id.). Compass claims that it had "no corresponding knowledge or suspicion that DiPaula and Miller had stolen Compass's trade secrets." (Id.).

In October 2016, Compass alleges that DiPaula and Miller poached six prominent Compass eCommerce employees for Flywheel's benefit: Justin Liu, eCommerce Account Manager; Andrew Fox, another eCommerce Account Manager; Mike O'Donnell, eCommerce Strategist; Alex McCord, Vice President and Accounts Manager of eCommerce; Dayna Acevedo, Chief of Staff; and Mike Menefee, eCommerce Account Executive (the "eCommerce Team"). (Id. ¶ 83). When they left, the eCommerce Team took with them a decade of specialized training, and perhaps even more significantly, "electronic or hard copy files that memorialized Compass's trade secret, proprietary, and confidential information regarding maximizing sales on Amazon." (Id. ¶ 85). The eCommerce Team continues to work at Flywheel. (Id. ¶ 83).

On January 20, 2020, a Compass employee discovered an August 25, 2015 Profitero article written by Miller titled, "The Future of Amazon Fresh?" (Id. at 42 n.1). The last line of the article stated, "Patrick Miller, Co-Founder, Flywheel Digital spent the last four years deconstructing eCommerce sites and helping American manufacturers figure out Amazon from a brand, search, social, customer service, supply chain, pricing and sales perspective." (Id. ¶ 184). After discovering the article, Compass engaged in "further research" and found a Flywheel power point presentation online that Miller gave at a conference on November 5, 2015. (Id. ¶ 186). Compass learned that Miller had included a review of several Compass clients or former clients in his presentation. (Id.). In any event, Compass claims that it was

not until January 2020 upon discovering the 2015 article that Compass "investigated whether any of the clients that left Compass since 2014 subsequently engaged Flywheel." (Id. ¶ 192). Indeed, it learned belatedly, Flywheel poached "a long list of Compass eCommerce clients," including Proctor & Gamble, Colgate, Johnson & Johnson, and McCormick. (Id. ¶ 193).

**2.      Claims of Widespread Fraud against the Whites**

Compass alleges that Daniel, Michael, and George (collectively, the "Whites") engaged in several fraud schemes to steal millions from Compass. As explained above, Daniel served as Compass' General Counsel from 1998 to November 23, 2018. (Id. ¶ 18). Michael, Daniel and John's brother, was Vice President of Operations and Comptroller of Compass from 2011 to November 23, 2018. (Id. ¶ 19). Finally, George, Michael's son, worked at Compass "managing Compass's IT systems" from 2004 until April 29, 2019. (Id. ¶ 20).

On November 1, 2018, Ascential, PLC bought Flywheel for $400 million. (Id. ¶ 21). Within a few days of the sale, "a storm began brewing inside [Compass] that involved Michael and Daniel White." (Id. ¶ 91). Compass alleges that a few days before the sale, Michael sent out a company-wide email "disparaging" John. (Id. ¶ 94). Compass does not explain how exactly Michael disparaged John or what caused the "storm" to brew. (See generally id.). Regardless, Compass unceremoniously explains that John fired Daniel and Michael on November 23, 2018. (Id. ¶ 94). After the firing, Compass hired a criminal investigator to look into Daniel and Michael's conduct at the company and discovered extensive unlawful activity. (Id. ¶ 97).

Compass claims that the Whites engaged in sweeping fraudulent schemes, which the Court condenses below:

Regarding the "Secret Compass Bank Account Scheme":

- On December 1, 2008, Michael and Daniel opened a checking account at the Community Bank of the Chesapeake and on June 15, 2009, Michael opened a separate savings account there, (id. ¶¶ 99–100);
- "From 2008 to 2020, Michael and Daniel White used these Secret Bank Accounts to financially benefit themselves" and their families, including by paying for their life insurance policies, an "unrelated gambling business," and a $200,000 transfer to the Washington Commanders football team, (id. ¶¶ 104–05);
- "[D]isbursements from the Secret Bank Accounts show that more than $3.4 million was disbursed to Michael, and more than $632,000 was disbursed to Daniel," (id. ¶ 106);

Regarding the "Ghost Employee Scheme":

- In 1998, Daniel and Michael added Michael's wife to Compass' payroll and "[p]rior to April 1, 2010," although Compass does not specify when exactly, Daniel and Michael added Daniel's wife to the payroll, (id. ¶¶ 109–10);
- In 2017, Daniel and Michael added Daniel's daughter to the Compass payroll, (id. ¶ 111);
- "In or around 2015," Daniel and Michael added one of Daniel's "colleague[s]" to Compass' payroll, (id. ¶ 112);
- Those individuals received payroll deposits from Compass, (id. ¶ 115);
- From 1998 to 2019, Michael covered up these "ghost employees" by creating false spreadsheets, (id. ¶ 118);

Regarding the "IRS Tax Check Scheme":

- "Michael created a tax check scheme that allowed him and Daniel to have money embezzled from Compass be

rebated back from and through the Internal Revenue Service," (id. ¶ 119);

- Michael issued himself additional electronic payroll payments as 100% tax withholding, "and would go to the IRS and to the state of Maryland," (id. ¶ 120);

- Michael "exclusively controlled" the payments and Michael and Daniel "embezzle[ed] millions of dollars from Compass," (id. ¶ 125);

Regarding the "Shareholder Loan Scheme":

- Michael "caused Compass" to send himself and Daniel "reimbursement for personal loans that were never made to the company," (id. ¶ 126);

- Michael caused Compass to issue payments to himself and to Daniel "purporting to be principal and interest payments against the fake loans," (id.);

- From 2015 to 2019, Michael and Daniel received checks from Compass with "LTC" written in the memo line, which Compass claims stands for "loan to company," (id. ¶ 127);

- Compass claims that it "recently discovered" an email from August 21, 2017, in which Daniel wrote Michael that anything his daughter made could "Come out of [his] BS loan," (id. ¶ 142);

Regarding the "Information Technology Lockout of Compass Business Records":

- On April 29, 2019, after Daniel and Michael were removed from the Board, "George had reason to believe that his removal was also imminent," and tried to "leverage his control over the Compass IT systems to extort additional payments for himself prior to his departure," (id. ¶ 146);

- George "demanded" a promotion with a $100,000 signing bonus, a new title, a base salary of $225,000, and a severance package, (id.);

- When Compass refused this "demand," George resigned, (id. ¶ 147);

- Then, at an unspecified time "after April 30, 2019," George maliciously cut off Compass access to employee email accounts using the

7

compassmarketinginc.com domain, as well as access to basic business software like "Microsoft," QuickBooks, and "other business records and accounts," (id. ¶ 149), which Compass curiously calls "the July Extortion Attempt";

- Compass claims that it "remains locked out" from its email and "had no choice but to start over" with a new IT infrastructure at "significant," but unspecified, expense, (id. ¶ 151);

Regarding the "Sham Legal Campaign:

- Finally, Compass claims that Michael and Daniel "attempted to cover up their illicit conduct" by filing a regulatory complaint against Compass with the Department of Labor, (id. ¶¶ 158–59); and
- The Department of Labor is still investigating Compass for violations of labor laws, which it claims has led it to incur "substantial legal fees," (id. ¶ 161).

**B.    Procedural History**

On February 14, 2022, Compass filed its Complaint premised upon federal question jurisdiction. (ECF No. 1). Compass alleges a litany of claims: violation of the Defend Trade Secrets Act of 2016 ("DTSA") against Flywheel Defendants (Count I); violation of the Maryland Uniform Trade Secrets Act ("MUTSA") against Flywheel Defendants (Count II); civil RICO under 18 U.S.C. § 1962(c) against all Defendants (Count III); civil RICO conspiracy under 18 U.S.C. § 1962(d) against all Defendants (Count IV); breach of contract against DiPaula and Miller (Count V); tortious interference with contract against DiPaula, Miller, and Flywheel (Count VI); tortious interference with prospective advantage against DiPaula, Miller, and Flywheel (Count VII); unfair competition against Flywheel Defendants (Count VIII); unjust enrichment against Flywheel Defendants (Count IX); fraudulent concealment/fraud against all Defendants (Count X); conspiracy to

misappropriate trade secrets against all Defendants (Count XI); conspiracy to breach contract against DiPaula and Miller (Count XII); conspiracy to tortiously interfere with contracts against DiPaula, Miller, and Flywheel (Count XIII); conspiracy to tortiously interfere with prospective advantage against DiPaula, Miller, and Flywheel (Count XIV); conspiracy to unfairly compete against all Defendants (Count XV); conspiracy to commit fraudulent concealment/fraud against all Defendants (Count XVI); aiding and abetting misappropriation of trade secrets against DiPaula, Miller, and Flywheel (Count XVII); aiding and abetting tortious interference with contracts against DiPaula, Miller, and Flywheel (Count XVIII); aiding and abetting tortious interference with prospective advantage against DiPaula, Miller, and Flywheel (Count XIX); aiding and abetting unfair competition against DiPaula, Miller, and Flywheel (Count XX); aiding and abetting fraudulent concealment/fraud  against all Defendants (Count XXI); conversion against Michael and George White (Count XXII); and finally breach of fiduciary duty against Daniel and Michael White (Count XXIII).

Flywheel Defendants filed a Motion to Dismiss on April 4, 2022. (ECF No. 23). Compass filed an Opposition on May 4, 2022 (ECF No. 44), and Flywheel Defendants filed a Reply on May 25, 2022 (ECF No. 48).

On April 25, 2022, George filed an Answer to Count XXII, conversion (ECF No. 40). That same day, Michael and George filed a Motion to Dismiss all other claims. (ECF No. 41). Compass filed an Opposition on May 16, 2022 (ECF No. 47), and Michael and George filed a Reply on May 31, 2022 (ECF No. 49).

Finally, Daniel filed a Motion to Dismiss on April 24, 2022 (ECF No. 42). On May 4, 2022, Compass filed an Opposition (ECF No. 47). Daniel filed a Reply on May 31, 2022 (ECF No. 50).

## II.   DISCUSSION

**A.   <u>Standard of Review</u>**

**1.   Rule 12(b)(6)**

The purpose of a Rule 12(b)(6) motion is to "test[] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." <u>King v. Rubenstein</u>, 825 F.3d 206, 214 (4th Cir. 2016) (quoting <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id.</u> Though the plaintiff does not have to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. <u>Goss v. Bank of Am., N.A.</u>, 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting <u>Walters v. McMahen</u>, 684 F.3d 435, 439 (4th Cir. 2012)), <u>aff'd</u>, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, accept the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. See Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs of Davidson Cnty., 407 F.3d 266, 268 (4th Cir. 2005). But the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).

### 2.     Rule 9(b)

Compass' allegations of fraud implicate the heightened pleading standard set forth in Federal Rule of Civil Procedure 9(b). Cozzarelli v. Inspire Pharm. Inc., 549 F.3d 618, 629 (4th Cir. 2008). The rule states: "In alleging fraud . . . a party must state with particularity the circumstances constituting fraud." Fed.R.Civ.P. 9(b). Under the rule, a plaintiff alleging claims that sound in fraud "must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." U.S. ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co., 612 F.3d 724, 731 (4th Cir. 2010) (quoting U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 379 (4th Cir. 2008)). In other words, "Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story." Crest Constr. II, Inc. v. Doe, 660 F.3d 346, 353 (8th Cir. 2011) (quoting Summerhill v. Terminix, Inc., 637 F.3d 877, 880 (8th Cir. 2011)).

As the Fourth Circuit has explained, Federal Rule of Civil Procedure 9(b) serves several salutary purposes:

> First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . . Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation.

Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999) (quoting U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield of Ga., Inc., 755 F.Supp. 1055, 1056–57 (S.D.Ga. 1990)). By its terms, however, Rule 9(b) permits a general averment of aspects of fraud that relate to a defendant's state of mind. It states, in part: "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b). Moreover, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." Harrison, 176 F.3d at 784.

## B.     **Analysis**

### 1.     **Limitations Defenses**

Compass alleges three federal claims: violation of the DTSA against the Flywheel Defendants (Count I);[2] civil RICO under 18 U.S.C. § 1962(c) against all Defendants (Count

---

[2] Compass also alleges violation of the Maryland analog to the DTSA, the MUTSA (Count II). The Court need not reach this claim, but it appears it would be time-barred for the same reasons above.

III); and civil RICO conspiracy under 18 U.S.C. § 1962(d) against all Defendants (Count IV). Defendants argue that some or all of the claims are barred by the applicable statutes of limitations. (Mem. Supp. Mot. Dismiss Flywheel ["Flywheel Mot."] at 13–17, ECF No. 23-1; Mem. L. Supp. Defs. Michael White & George White Mot. Dismiss ["Michael & George Mot."] at 7–10, ECF No. 41; Mem. L. Supp. Daniel White Mot. Dismiss ["Daniel Mot."] at 4–6, ECF No. 42-1). As such, the Court will first assess the timeliness of Compass' DTSA and RICO claims against Flywheel Defendants and then will address Compass' RICO claims against the Whites.

Trade secret appropriation under the DTSA "may not be commenced later than 3 years after the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d). RICO claims "are governed by a four-year statute of limitations, which runs from the date when the plaintiff discovered, or should have discovered, the injury." Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc., 262 F.3d 260, 266 (4th Cir. 2001).

### a.    Flywheel Defendants (Counts I, III, IV)

Compass premises its DTSA and RICO claims against Flywheel Defendants on the alleged theft of its trade secrets. Flywheel Defendants argue that the claims are time-barred because Compass should have discovered the misappropriation through the exercise of due diligence in 2014, or no later than 2016, and Compass did not file suit until February 14, 2022. (Flywheel Mot. at 15–17). Compass responds that because it did not discover the power point presentation until 2020, the three-year statute of limitations did not start until

then, "at the earliest." (Pl.'s Opp'n Flywheel Defs.' Mot. ["Opp'n Flywheel Mot."] at 26–27, ECF No. 44). The Court agrees with Flywheel Defendants for several reasons and will dismiss the claims.

As an initial matter, the Court acknowledges that it can only reach limitations defenses at the 12(b)(6) stage in certain instances. Indeed, "[a] defendant's claim that an action is time-barred is an affirmative defense that it can raise in a motion to dismiss when the 'face of the complaint includes all necessary facts for the defense to prevail.'" Meridian Investments, Inc. v. Fed. Home Loan Mort. Corp., 855 F.3d 573, 577 (4th Cir. 2017) (quoting Leichling v. Honeywell Int'l, Inc., 842 F.3d 848, 850–51 (4th Cir. 2016)). For reasons explained more fully below, the Court finds that all facts necessary to decide whether Flywheel Defendants' affirmative defense applies to Compass' trade secret claims, including when the causes of action first accrued, appear on the face of Compass' Complaint. The Court will therefore reach Flywheel Defendants' affirmative defense.

Here, Compass describes several events in its Complaint that triggered the applicable statutes of limitations. First, it should have discovered the alleged misappropriation through the exercise of reasonable diligence in 2014 when two of its "trusted senior executives" left to form Flywheel, a direct competitor. (See Compl. ¶ 5). Miller and DiPaula did not keep their plan to form their own eCommerce company a secret—according to Compass' own allegations, which the Court accepts as true, they emailed John multiple times in September and October 2014 about how they were leaving to start their own business and how they hoped to buy Compass' eCommerce department. (Id. ¶¶ 15, 75, 78). At that time, Compass was on inquiry notice that Miller and DiPaula

might take Compass' proprietary information with them. Thus, the three-year statute of limitations for the DTSA claim ran in late 2017 and the four-year limitations period for the RICO claims, to the extent they are premised on theft of trade secrets, ran in 2018.

Second, even if the Court were to presume that Compass had no reason to investigate whether its "trusted" eCommerce executives might misappropriate its trade secrets during Flywheel's formation, Compass should have discovered the misappropriation no later than 2016. Compass alleges that in October 2016, there was a "mass exodus" of six of its eCommerce department employees to Flywheel. (Id. ¶ 83). Compass claims that DiPaula and Miller specifically "recruited" the eCommerce Team "to unlawfully compete with Compass using Compass's trade secrets and proprietary information." (Id. ¶ 84). Moreover, Compass claims that the eCommerce Team actually stole electronic or hard copy files "that memorialized Compass's trade secret, proprietary, and confidential information regarding maximizing sales on Amazon." (Id. ¶ 85). Reasonable diligence required Compass to investigate the "mass exodus" of its employees to a rival and ensure that those employees did not take its proprietary information with them. (See id.). Accordingly, even under a more forgiving read of the facts on the surface of Compass' Complaint, the statute of limitations for the DTSA claim against the Flywheel Defendants ran in 2019 and the RICO claims ran in 2020.

Further, Compass' argument that it could not discover the trade secret appropriation until 2020 strains credulity. The Profitero blog post it allegedly found in 2020 was posted online in 2015. If Compass exercised reasonable diligence, it would have found this

publicly accessible article written by its former executive and specifically mentioning Amazon, eCommerce, Flywheel, and Miller much sooner.

More importantly, Compass should have noticed the potential misappropriation when it began to lose prominent clients to Flywheel. In its own words, Flywheel "poached a long list of Compass eCommerce clients, including well-established brands such as [Proctor & Gamble], Allergan, Amplify Snacks Brands, Colgate, Ferrero, Johnson & Johnson, Mars, McCormick, Old Wisconsin, and 5 Hour Energy." (Id. ¶ 193). It is implausible that Compass never noticed or investigated these client losses in real time, and reasonable diligence required it to inquire as to where those clients went and whether Flywheel could be using its proprietary information to "poach" those clients. It is hard to imagine a scenario in which there could be more facts suggesting inquiry notice than exist here.

At the end of its Opposition, Compass argues that even if Flywheel Defendants are right about the notice, the "continuing harm" or "continuous violation" doctrine should toll the applicable statutes of limitations, rendering its claims timely. (See Opp'n Flywheel Mot. at 29). Compass does not cite any binding precedent in support of its theory. (See id.). Rather, Compass cites a lone, unreported decision from the Southern District of New York that states that, under New York law, "[t]he date of accrual may be extended under the continuing tort doctrine where the 'defendant has kept a secret confidential but continued to use it for commercial advantage.'" See iSentium, LLC v. Bloomberg Fin. L.P., No. 17-cv-7601, 2020 WL 248939, at *8 (S.D.N.Y. Jan. 16, 2020). Notably, even there, the court did not toll the deadline in question under the doctrine. Instead, it granted summary

judgment in favor of defendant because, much like here, it found that plaintiff should have discovered the misappropriation sooner. See id. Therefore, the New York case is of little help to Compass.

In any event, review of Maryland law reveals that the State has never applied the doctrine to a trade secret claim before, and the Court declines to expand the doctrine's use. In Cain v. Midland Funding, LLC, 256 A.3d 765 (Md. 2021), the Maryland Supreme Court explained that the continuing harm doctrine is typically applied in "limited contexts" such as "nuisance, trespass, and other tort cases." Id. at 791. The court did a thorough review of the Maryland precedent on the doctrine, and it appears that Compass' request would be novel under state law. See id. (summarizing caselaw on continuing harm doctrine and declining to extend it to subject consumer debt dispute); Shell Oil Co. v. Parker, 291 A.2d 64, 67 (Md. 1972) (applying doctrine without discussion regarding false advertisement on billboard); MacBride v. Pishvaian, 937 A.2d 233, 241 (Md. 2007)  (declining to extend doctrine to landlord tenant dispute regarding water damage in apartment), abrogated by Litz v. Md. Dep't Env't, 76 A.3d 1076 (Md. 2013); Litz, 76 A.3d at 1091 (applying the doctrine in a nuisance claim regarding leaching effluent from failing septic systems); Duke St. v. Bd. Comm'rs of Calvert Cnty., 684 A.2d 40 (Md.Ct.Spec.App. 1996) (declining to apply doctrine to claim plaintiff was coerced into deeding his land for a public street). Compass does not address Maryland precedent in its briefing and does not offer any compelling reasons to apply the "limited" continuing harm doctrine here, particularly where Maryland has yet to extend it to such claims. (See Opp'n Flywheel Mot. at 29).

For these reasons, Compass' claims against the Flywheel Defendants are barred by the applicable statutes of limitations. The Court will grant Flywheel Defendants' Motion to Dismiss as to Counts I, III, and IV.[3]

### b. Daniel, Michael, and George White (Counts III & IV)

Next, the Whites argue that that Compass' federal RICO claims that predate February 14, 2018, four years before Compass filed the Complaint, are time barred. (Michael & George Mot. at 7; Daniel Mot. at 4–5). The Court declines to dismiss the RICO claims against the Whites based on limitations.

Again, the Court may not consider a statute of limitations defense at the motion to dismiss stage unless the "face of the complaint includes all necessary facts for the defense to prevail." Meridian Investments, 855 F.3d at 577 (quoting Leichling, 842 F.3d at 850–51). Here, Compass' claims against the Whites do not contain all the necessary facts for the Court to reach a determination on limitations. Compass' claims are broad and occasionally vague, and thus more fact-finding would be necessary before the Court could assess notice. For example, Compass alleges:

- From 2008 to 2020, Michael and Daniel used "secret" bank accounts funded by Compass to financially benefit themselves and their families, (Compl. ¶¶ 99–106);

---

[3] Compass' DTSA claim against the Flywheel Defendants would also fail to the extent it seeks relief for the theft of trade secrets that took place before May 11, 2016. That is when the DTSA became effective, and it does not apply retroactively. See 18 U.S.C. § 1836. Thus, even if the DTSA claim were timely, Compass would fail to state a claim under 12(b)(6) regarding any conduct that preceded the date of DTSA's effectiveness—significantly, any theft of trade secrets that took place in 2014, when Miller and DiPaula left to form Flywheel, or 2015, when Miller wrote the Profitero article and presented the power point at a conference.

- From 1998 to 2019, Michael and Daniel added their family members, who Compass does not mention were by extension John's family members as well, to Compass' payroll as "ghost employees," (id. ¶¶ 109–18);
- Michael and Daniel "attempted to cover up their illicit conduct" by filing a regulatory complaint against Compass with the Department of Labor, which is still investigating Compass, (id. ¶¶ 158–61);
- Michael and Daniel embezzled millions of dollars from Compass through an IRS tax scheme, (id. ¶¶ 119–25);
- On April 29, 2019, after Compass fired Michael and Daniel, George tried to "leverage" his control over Compass IT systems to "demand" a promotion. When Compass refused, George resigned. Then, at some unspecified time "after April 30, 2019," George locked Compass out of its email domain and from using Microsoft, Quickbooks, and other online accounts in an "extortion attempt." Compass does not indicate that George requested a raise after he resigned, (id. ¶¶ 146–49).

Compass' allegations are far-reaching and often include only vague details about the dates of the alleged conduct and the sources of that information. Although Compass explains that it discovered the alleged misdeeds after hiring a private investigator, it does not plead details about how the investigator discovered this alleged misconduct, what concrete evidence exists of the misconduct, or whether or when Compass had access and control over the sources of this information. Accordingly, although Compass' claims include events that occurred well outside the four-year statute of limitations, the Complaint does not contain all the facts necessary for the Court to reach the Whites' limitations defenses now. Thus, the Court will deny the Whites' Motions on these grounds. Still, the Court's decision should not be read as a finding that Compass' RICO claims against the Whites are timely.

### 2.      Failure to State a Claim

Next, the Court turns to whether Compass has stated claims against the Whites for civil RICO and RICO conspiracy under Rule 12(b)(6). At bottom, the Court finds that Compass has not and will dismiss the claims.

The RICO statute prohibits the conduct of an "enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). RICO establishes criminal penalties and also "a private civil right of action to '[a]ny person injured in his business or property by reason of a violation of the RICO provisions.'" Hardwire, LLC v. Ebaugh, No. JKB-20-0304, 2021 WL 3809078, at *5 (D.Md. Aug. 26, 2021) (quoting ESAB Grp., Inc. v. Centricut, Inc., 126 F.3d 617, 626 (4th Cir. 1997)). "A civil RICO action 'is a unique cause of action that is concerned with eradicating organized, longterm, habitual criminal activity.'" Ekstrom v. Cong. Bank, No. ELH-20-1501, 2020 WL 6565251, at *16 (D.Md. Nov. 9, 2020) (quoting U.S. Airline Pilots Ass'n v. Awappa, LLC, 615 F.3d 312, 317 (4th Cir. 2010)). To properly plead a civil RICO claim, plaintiffs must allege "1) conduct [causing injury to business or property] 2) of an enterprise 3) through a pattern 4) of racketeering activity." Id. at *17 (alteration in original) (citing Morley v. Cohen, 888 F.2d 1006, 1009 (4th Cir. 1989)). A RICO conspiracy claim, on the other hand, "requires that the plaintiff allege and later prove that the defendants knew of the RICO violations of the enterprise and agreed to facilitate those activities." Chambers v. King Buick GMC, LLC, 43 F.Supp.3d 575, 607 (D.Md. 2014). As various fraud claims are asserted as the predicate acts for this civil RICO violation, Rule 9(b)'s particularity requirement applies. Ekstrom, 2020 WL 6565251 at *19.

In evaluating the viability of a RICO claim, the United States Court of Appeals for the Fourth Circuit instructs courts to differentiate between "garden-variety fraud claims," which do not amount to a RICO violation, and "cases involving a more serious scope of activity." See Al-Abood ex rel. Al-Abood v. El-Shamari, 217 F.3d 225, 238 (4th Cir. 2000). Courts have "limit[ed] [RICO's] severe penalties to offenders engaged in ongoing criminal activity, rather than isolated wrongdoers." Ekstrom, 2020 WL 6565251, at *17 (quoting Friedler v. Cole, No. CCB-04-1983, 2005 WL 465089, at *7 (D.Md. Feb. 28, 2005)). Indeed, RICO "is reserved for conduct whose scope and persistence pose a special threat to social well-being." Id. (quoting Biggs v. Eaglewood Mortg., LLC, 582 F.Supp.2d 707, 714 (D.Md. 2008)). Thus, the Court "will not lightly permit ordinary business contract or fraud disputes to be transformed into federal RICO claims." Flip Mortg. Corp. v. McElhone, 841 F.2d 531, 538 (4th Cir. 1988).

Compass' RICO claims fail because it has not established that the Whites were engaged in an enterprise. An "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). A plaintiff must establish three elements: "(1) an ongoing organization; (2) associates functioning as a continuing unit for a common purpose; and (3) the enterprise is an entity separate and apart from the pattern of activity in which it engages." Rojas v. Delta Airlines, Inc., 425 F.Supp.3d 524, 537 (D.Md. 2019). Significantly, "a RICO enterprise requires the existence of collaboration or agreement between the members of the enterprise." Id. Further, "[b]ecause the core of a RICO civil conspiracy is an agreement to commit predicate acts,

a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement." Chambers, 43 F.Supp.3d at 607 (quoting Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 25 (2d Cir. 1990)).

Although Compass alleges that Daniel and Michael "engaged in a pattern of egregious behavior" since 2008, it has not pleaded that they formed any type of agreement to engage in that conduct. (Compl. ¶ 255). At most, Compass claims that Defendants generally, including Flywheel Defendants, participated in a "coordinated effort to cause Compass financial harm." (Id. ¶ 258). That is simply not enough—conclusory allegations regarding an agreement are insufficient to state a RICO claim. See Rojas, 425 F.Supp.3d at 538 (finding that general allegation that a "collective decision was made" did not properly establish a RICO enterprise); SD3, LLC v. Black & Decker Inc., 801 F.3d 412, 437 (4th Cir. 2015) (finding no agreement where plaintiffs alleged only that "a collective decision was made"). As Compass has failed to provide "specific allegations as to how, when, or where" any agreement took place, it has not stated a RICO or RICO conspiracy claim. See Rojas, 425 F.Supp.3d at 538; Twombly, 550 U.S. at 555 (stating that courts must ignore conclusory allegations or formulaic recitations of the elements of a claim); Grant v. Shapiro & Burson, LLP, 871 F.Supp.2d 462, 473 (D.Md. 2012) (dismissing RICO complaint with "no factual averments" regarding agreement between defendants); Chambers, 43 F.Supp.3d at 607–08 (dismissing civil RICO conspiracy complaint where it contained conclusory statement that defendants "worked in combination with each other" to engage in fraud).

Curiously, in its Opposition, Compass claims that "the RICO enterprise alleged in the Complaint is Compass itself." (Pl.'s Opp'n Michael White & George White Mot. ["Opp'n Michael & George Mot."] at 14, ECF No. 47 (emphasis in original)). Despite Compass' willingness to implicate itself in a racketeering scheme, it mischaracterizes the allegations in the Complaint—Compass only substantively describes the RICO "enterprise" as Flywheel, not Compass itself. (Compl. ¶ 86). Nowhere does Compass allege that it was the RICO enterprise through which the Whites operated. (See generally id.). Regardless, Compass' claims still fail because it never pleads an agreement between the Whites to engage in any fraud.[4]

Accordingly, the Court will grant the Whites' Motions as to Counts III and IV and dismiss the claims.

---

[4] Although the Court need not reach it, Compass' claims against George White would also fail because it has not alleged that he engaged in a pattern of racketeering activity. A "pattern of racketeering activity" requires "at least two acts of racketeering activity." 18 U.S.C. § 1961(5). At least two predicate acts are required, but two acts alone still may not necessarily establish a pattern. GE Inv. Priv. Placement Partners v. Parker, 247 F.3d 543, 549 (4th Cir. 2001). In order to show a pattern of racketeering activity, the plaintiff must demonstrate "that the predicate acts are related and that they 'amount to or pose a threat of continued criminal activity.'" Id. (quoting H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989)).

The bulk of Compass' allegations are against Daniel and Michael. As for George, Compass' alleges that he requested a raise, which it refers to as "extortion," resigned when he did not receive the raise, and at some unspecified point, locked Compass' email access and access to certain programs. (Compl. ¶¶ 146–52). Of these, the only allegedly "criminal" act was the IT lockout—Compass does not allege any facts to suggest that George threatened the company some way when he requested a raise to justify its use of the term "extortion." Thus, Compass has only alleged one predicate act against George, and that is insufficient under the statute. See Parker, 247 F.3d at 549.

### 3.     State Law Claims

Compass alleges a litany of other claims under state law. (Counts II, V–XXIII). Federal district courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States" under 28 U.S.C. § 1331, as well as those "where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States" under 28 U.S.C. § 1332(a). Still, federal courts are courts of limited jurisdiction and "may not exercise jurisdiction absent a statutory basis." Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005). "A court is to presume, therefore, that a case lies outside its limited jurisdiction unless and until jurisdiction has been shown to be proper." United States v. Poole, 531 F.3d 263, 274 (4th Cir. 2008) (citing Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377 (1994)). "[B]efore a federal court can decide the merits of a claim, the claim must invoke the jurisdiction of the court." Miller v. Brown, 462 F.3d 312, 316 (4th Cir. 2006).

Here, Compass no longer has any surviving claims under federal law. The Court has discretion to exercise supplemental jurisdiction "[w]henever the basis for federal jurisdiction evaporates," and may decline to do so when it "has dismissed all claims over which it has original jurisdiction." Shanaghan v. Cahill, 58 F.3d 106, 110 (4th Cir. 1995); 28 U.S.C. § 1367(c)(3). "Among the factors that inform this discretionary determination are convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." Russell v. Cont'l Rest., Inc., 430 F.Supp.2d 521, 528 (D.Md. 2006). The Court declines to exercise supplemental

jurisdiction here, where it has dismissed all federal claims, the complaint presents no federal policy issues, and the Court has an extensive docket of cases over which it exercises original jurisdiction. The remaining claims should be presented to a state court. Accordingly, the Court will dismiss the Complaint in its entirety.

### III.    CONCLUSION

For the foregoing reasons, the Court will grant Flywheel Defendants' Motion to Dismiss (ECF No. 23), Defendants Michael and George White's Motion to Dismiss (ECF No. 41), and Defendant Daniel White's Motion to Dismiss. (ECF No. 42).

A separate Order follows.

Entered this 24th day of February, 2023.

_____/s/_____

George L. Russell, III
United States District Judge